77 S.E.2d 122 (1953)
STATE ex rel. TRENT et al.
v.
SIMS, Auditor.
No. 10575.
Supreme Court of Appeals of West Virginia.
Submitted April 15, 1953.
Decided May 18, 1953.
Concurring Opinion July 15, 1953.
*127 J. Hornor Davis, II, Preston & Davis, Vincent V. Chaney, Charleston, for petitioners.
John G. Fox, Atty. Gen., Thomas J. Gillooly, T. D. Kauffelt, Asst. Attys. Gen., for defendant. *123 *124 *125
*126 RILEY, Judge.
In this original proceeding in mandamus of State of West Virginia at the relation of W. W. Trent, State Superintendent of Free Schools; Milton J. Ferguson, State Tax Commissioner; and Denzil Lee Gainer, Director of the Budget, ex officio members of and constituting The State Board of School Finance, against Edgar B. Sims, Auditor of The State of West Virginia, the petitioners request a writ of mandamus directed against the respondent, who heretofore has *128 refused to honor a requisition submitted to him by the petitioners as The State Board of School Finance in the amount of $24,017.48, representing state aid to schools; and this Court heretofore having issued a rule against respondent, returnable April 14, 1953, directing him to show cause, if any he can, why a writ of mandamus should not be awarded against him as prayed for, the case was submitted to the Court for decision on the return day upon the petition, respondent's answer, in which respondent admits all of the facts well pleaded, and denies all conclusions of law stated therein, and upon petitioners' demurrer to respondent's answer, petitioners' replication and respondent's rejoinder to the replication.
Prior to the convening of the 1953 session of the Legislature, the Board of Public Works, in accordance with the provisions of Section 51 of Article VI of the Constitution of West Virginia, prepared two budgets, one for the fiscal year 1953-54 and the other for the fiscal year 1954-55, and an accompanying financial statement which included an estimate of the unappropriated surplus as of June 30, 1953, and an estimate of the revenues of the State available for the 1953-55 biennium. These budgets, with the accompanying statement, were embodied in a paper back book, which the board designates "Budget Document". This, together with a budget bill for all proposed appropriations of the two budgets, also prepared by the board, as provided by Section 51, Article VI, West Virginia Constitution, was delivered to the presiding officer of each house of the Legislature. This bill, hereinafter designated as the "budget bill", having been amended by the incorporation therein of Section 1, embracing a statement of the finding and general policy of the Legislature and containing many amendments, hereafter to be detailed, was passed on March 14, 1953, effective from passage, and entitled "An Act making an appropriation of public money out of the treasury in accordance with section fifty-one, article six of the Constitution". Hereinafter this Act will be designated as the "budget act", or as Committee Substitute for Senate Bill No. 1.
On March 14, 1953, the day upon which both houses of the 1953 Legislature adjourned sine die, and before the budget act was enacted, the Honorable Glenn Jackson, Chairman of the Senate Finance Committee, and the Honorable W. P. C. Perry, Chairman of the House Finance Committee, addressed a letter on behalf of the Conference Committee of the House and Senate to the Board of Public Works, requesting amendments of the appropriations contained in the budgets for the biennium 1953-55, made by the Board of Public Works, and provided for in the budget bill in the additional amounts of $5,758,620, $2,494,560 for the year 1953-54, and $3,264,060 for the year 1954-55. In this letter the two chairmen invited the attention of the members of the Board of Public Works to the fact that the budget act made reductions in the amounts set forth in the budget bill of $3,758,620, and the two chairmen in this letter of March 14, 1953, stated that the difference of approximately two million dollars is based upon the finding of the Finance Committees of the House and Senate that anticipated revenues will, in all probability, be a million dollars more each year than the Board of Public Works finally estimated; and, specifically, this letter stated that the Senate and House Finance Committees anticipated: (1) a five hundred thousand dollar annual increase in the revenues of the West Virginia Racing Commission, based upon the large increase in the number of racing days recently approved by the commission, and upon the anticipated substantial improvement in the business of a new track at Waterford; and (2) a five hundred thousand dollar increase in the profits of the West Virginia Liquor Control Commission, based upon the recent executive action of the Governor of this State in abolishing the enforcement bureau of that commission, and upon a further anticipated reduction in the number of employees by the action of the Governor and by reason of budgetary limitations to be imposed by the Legislature. Accompanying *129 this letter there was a detailed statement of various items contained in the budget bill and the amendments to the bill suggested by the Chairmen of the Finance Committees of the House and Senate.
In reply to this letter the Board of Public Works declined the request of the Chairmen of the Finance Committees of the House and Senate to raise the estimated revenues for the 1953-1955 biennium, and stated that its declination was based upon the fact that two principal sources of State revenue indicate diminishing revenue for the ensuing biennium, namely, (1) the reduction in the receipts of the West Virginia Liquor Control Commission, and (2) the poor economic condition of the coal industry, the State's major industry, as shown by an expression of the President of the State Senate in the morning newspaper of Charleston of March 14, 1953. In this letter the Board of Public Works stated that: "The substantial portion of the cuts made to effect the increases you ask came from the Department of Public Assistance in the amount of a million dollars or more annually. This will seriously cripple the Department. The Board of Public Works feels that it has a duty toward the more unfortunate citizens of our State to protect them as best it can when the budget is under consideration."
These letters between the Chairmen of the Senate and House Finance Committees, and the suggestions as to proposed increases attached to and made a part of the letter of the two chairmen, and the Board of Public Works on March 14, 1953, are set forth in the Journal of the Senate, Regular Session, 1953, March 14, 1953, at pages 82 to 100, inclusive.
At this point it may be well to note that Item No. 39, contained in the detailed statement attached to the letter of the Chairmen of the Senate and House Finance Committees, provides for a suggested appropriation for the Department of Education for temporary supplemental aid to counties to be distributed by The State Board of School Finance for the biennium 1953-55 "in accordance with a new formula for the distribution of state aid to schools", approved by the Governor, in the amount of $2,500,000.
Upon receipt of the letter from the Board of Public Works both the Senate and the House of Delegates voted on and passed Committee Substitute for Senate Bill No. 1, which enacted into law the budget act under appraisal, entitled: "An Act making an appropriation of public money out of the treasury in accordance with section fiftyone, article six of the constitution."
This Act, in Section 1, amended the budget bill submitted by the Board of Public Works to the effect that the estimates of funds in the treasury at the time this Act was enacted and expected revenue to accrue prior to July 1, 1953, and during the ensuing biennium of 1953-55 will furnish funds sufficient to pay:
"(1) Expense of the legislature;
"(2) Expense of the executive department;
"(3) Expense of the judiciary department;
"(4) Interest and principal on the debts of the state;
"(5) Salaries payable under the constitution and laws of the state;
"(6) Aid to public schools;
"(7) Expenses for other purposes required by the constitution and laws of the state, and to meet appropriations herein made, and, in pursuance of such finding, this act is enacted."
The original budget bill, which showed a total amount available for appropriation by the 1953 Legislature of $191,170,823.84, was amended by the budget act, which provided for appropriations for the 1953-55 biennium in the amount of $192,766,000.09, a difference of $1,595,176.25. These amounts are set forth in Appendix A of respondent's brief, and on the oral argument counsel for petitioners stated that *130 they were correct. On this basis the respondent auditor contends that the budget act creates a deficit in the latter amount of $1,595,176.25, which under Section 51 of Article VI of the Constitution of West Virginia, renders the act unconstitutional in its entirety.
Specifically and in detail the budget act amended the original budget bill as follows:

 Original Bill As Amended
 Item 1953-54 1954-55 1953-54 1954-55
 Acct. No. 123
 Personal Services $ 95,280 $ 95,280 $ 112,580 $ 112,580
 Acct. No. 240
 Other Personal Services 61,500 61,500 91,500 91,500
 Acct. No. 280
 Personal Services 12,360 12,360 12,620 12,620
 Acct. No. 295
 State Aid to Supplement the
 General School Fund 42,650,000 42,650,000 44,150,000 44,950,000
 Acct. No. 298
 Employers' Accumulation Fund
 to match contribution of
 members 2,500,000 2,500,000 3,100,000 3,140,000
 Acct. No. 300
 Personal Services 3,351,510 3,349,510 3,551,510 3,549,510
 Acct. No. 300
 Current Expenses 534,500 534,500 577,400 577,400
 Acct. No. 300
 Repairs and Alterations 237,500 237,500 254,500 254,500
 Acct. No. 321
 Personal Services 412,040 412,040 418,340 418,340
 Acct. No. 328
 Personal Services 635,800 635,800 640,300 640,300
 Acct. No. 333
 Personal Services 272,480 272,480 292,480 292,480
 Acct. No. 383
 Equipment 7,500 7,500 15,500 7,500
 Acct. No. 431
 Equipment 20,000 20,000 39,500 20,000
 Acct. No. 486
 Personal Services 25,140 25,140 26,140 26,140
 Acct. No. 495
 To pay per diem of members
 and other general expenses 50,000 50,000 65,000 65,000
 Acct. No. 515
 W. Va. State Fair 20,000 20,000 25,000 25,000
 Acct. No. 515
 Mountain State Forest Festival 7,500 7,500 10,000 10,000
 Acct. No. 564
 In aid of Memorial Day Patriotic
 Exercises 500 500 1,000 1,000

*131
 Special Revenue Fund
 Acct. No. 661
 Salaries of Commissioners 18,000 18,000 22,500 22,500
 Acct. No. 661
 Other Personal Services 178,300 178,300 240,000 240,000
 Acct. No. 663
 Personal Services 815,500 815,500 899,180 899,180
 General School Fund
 Acct. No. 700
 Personal Services 23,360 23,360 23,620 23,620

 Section 5Appropriations from Surplus
 Revenues
 Item 1 50,000* 170,000
 Item 12 115,000* 136,000
 Item 37 5,000* 45,000
*Also added new purpose

Special Revenue Fund

 Acct. No. 663 1953-54 1954-55
 White Pine Blister Rust
 Control 5,000* 5,000*
 Oak Wilt Control 10,000* 10,000*
 To Match Pittman-Robertson 80,000* 80,000*
 Dingell-Johnson 14,000* 14,000*
 For payment of bounties 5,000 5,000
 For construction of
 ponds and small lakes 65,000 65,000
 For restocking of game 45,000 45,000
 * These items approved in original budget
 bill from General Revenue, Account
 No. 521.

Section 3Deficiency Appropriations

 Acct. No. 295
 Lines 1-4 25,000

Section 4Awards for Claims Against the State

 Claims Versus State Road Commission
 (To be paid from State
 Road Fund)
 Colonial Glass Company 335.35
 Jarrell, Roger Dale, by Eugene
 Jarrell, his father and legal
 guardian 200.00
 Meadows, O. W. 117.18
 Meadows, Ocie 150.00
 Wilkinson, Fred N. 50.00
 Claims Versus State Tax Commissioner
 (To be paid from State
 Road Fund)
 Corbin, Frank P. d/b/a Osgood
 Bus Lines 558.80
 Claims Versus State Board of Control
 (To be paid from General
 Revenue Fund)
 Reynolds, James 550.00
 Claims Versus State Board of Control
 Huntington State Hospital
 (To be paid from General Revenue
 Fund)
 Crichton Engineering Company 2,903.00
 Claims Versus Potomac State College
 of West Virginia University
 (To be paid from General
 Fund)
 Melody, Thomas 20.00
 Zacot, Francis 93.00
 Beal, Edward 255.73
 Pendergrast, Robert 15.00
 Claims Versus State Tax Commissioner
 (To be paid from General
 Revenue Fund)
 American Oil Company 674.83
 Claims Versus State Auditor
 Criminal Claims Department
 (To be paid from General Revenue
 Fund)

*132
 Chambers, Thurman, Sheriff of
 Mingo County 82.40
 Dean, James J., Sheriff of
 Greenbrier County 137.80
 Frame, Drexell, Sheriff of Gilmer
 County 20.00
 Morrison, F. A., Sheriff of Mason
 County 20.20
 Pugh, Warren W., Sheriff of
 Ohio County 63.00
 Smith, Houston A. 300.00
 Wilson, Howard E., Sheriff of
 Clay County 149.70
 Wright, Dick, Sheriff of Hancock
 County 283.70

Section 5Appropriations from Surplus Revenues

 Item 2........................... 700,000
 Item 3........................... 16,000
 Item 4........................... 12,000
 Item 5........................... 40,000
 Item 8........................... 500,000
 Item 10.......................... 4,000
 Item 11.......................... 85,000
 Item 14.......................... 50,500
 Item 15.......................... 21,750
 Item 17.......................... 225,000
 Item 19.......................... 8,000
 Item 33.......................... 8,000
 Item 36.......................... 10,000
 Item 38.......................... 55,000
 Item 41.......................... 293,000

The respondent auditor, in his answer to the petition, sets out the following reasons for his refusal to honor the draft of The State Board of School Finance in the amount of $24,017.48: (1) The budget act creates a deficit, and therefore is unconstitutional in its entirety; (2) the budget act is unconstitutional in its entirety because of the nature and extent of the amendments to the budget bill submitted by the Board of Public Works made by the Legislature, as follows:
"a. The Budget Bill was amended by the addition of entirely new items other than those contained in the original bill, and is unconstitutional as to those items.
"b. The Budget Bill was amended by increasing the items relating to other than the Legislature and the Judiciary and is unconstitutional as to those items.
"c. The Budget Bill was amended by the addition of miscellaneous materials and is unconstitutional as to those additional materials.
"d. The Budget Bill was amended by diminishing the items relating to the Judiciary and is unconstitutional as to those items."
and (3) the specific item in the amount of $24,017.48 appropriated in the budget act, and upon which petitioners' requisition is drawn, was not set forth in the budget bill or in the budget document, but having been incorporated in the budget act, the act is unconstitutional in that regard.
Section 51 of Article VI of the Constitution of West Virginia, now under consideration, known as "The Budget Amendment" added to said Article VI, was proposed by Senate Joint Resolution No. 1, adopted on May 23, 1917 (Acts West Virginia Legislature, 1917, Extraordinary Session), and was ratified at the general election in 1918 by a vote of 51,405 for ratification and 26,651 against ratification, or a majority of 24,754. This section reads:
"The Budget System
"51. The Legislature shall not appropriate any money out of the treasury except in accordance with the following provisions:
"Sub-Section A
"Every appropriation bill shall be either a budget bill, or a supplementary appropriation bill, as hereinafter mentioned.
"Sub-Section B

"First: Within ten days after the convening of the Legislature, unless such time shall be extended by the Legislature for the sessions at which *133 the budget is to be submitted, the board of public works, which shall consist of the governor, secretary of state, auditor, treasurer, attorney general, superintendent of free schools and commissioner of agriculture, shall submit to the Legislature, two budgets, one for each of the ensuing fiscal years. Each budget shall contain a complete plan of proposed expenditures and estimated revenues for the particular fiscal year to which it relates; and shall show the estimated surplus or deficit of revenues at the end of such year. Accompanying each budget shall be a statement showing: (1) the revenues and expenditures for each of the two fiscal years next preceding; (2) the current assets, liabilities, reserves and surplus or deficit of the State; (3) the debts and funds of the State; (4) an estimate of the State's financial condition as of the beginning and end of each of the fiscal years covered by the two budgets above provided; (5) any explanation the board of public works may desire to make as to the important features of any budget and any suggestion as to methods for the reduction or increase of the State's revenue.
"Second: Each budget shall be divided into two parts, and the first part shall be designated `Governmental Appropriations' and shall embrace an itemized estimate of the appropriations: (1) for the Legislature as certified to the board of public works in the manner hereinafter provided; (2) for the executive department; (3) for the judiciary department, as provided by law, certified to the Governor by the auditor; (4) to pay and discharge the principal and interest of any debt of the State of West Virginia hereafter created in conformity with the Constitution, and all laws enacted in pursuance thereof; (5) for the salaries payable by the State under the Constitution and laws of the State; (6) for the aid of public schools in conformity with the laws of the State; (7) for such other purposes as are set forth in the Constitution and laws made in pursuance thereof.
"Third: The second part shall be designated `General Appropriations,' and shall include all other estimates of appropriations.
"The board of public works shall deliver to the presiding officer of each House the budgets and a bill for all the proposed appropriations of the budgets clearly itemized and classified; and the presiding officer of each House shall promptly cause said bill to be introduced therein, and such bill shall be known as the `Budget Bill.' The board of public works may, before final action thereon by the Legislature, amend or supplement either of said budgets to correct an oversight or in case of an emergency, with the consent of the Legislature by delivering such an amendment or supplement to the presiding officers of both Houses; and such amendment or supplement shall thereby become a part of said budget bill as an addition to the items of said bill or as a modification of or a substitute for any item of said bill such amendment or supplement may affect.
"The Legislature shall not amend the budget bill so as to create a deficit but may amend the bill by increasing or diminishing the items therein relating to the Legislature, and by increasing the items therein relating to the judiciary, but except as hereinbefore specified, may not alter the said bill except to strike out or reduce items therein; Provided, however, that the salary or compensation of any public officer shall not be increased or diminished during his term of office; and such bill when and as passed by both houses shall be a law immediately without further action by the governor.
"Fourth: The governor and such representatives of the boards, officers and commissions of the State expending or applying for State's money as have been designated by the board of public works for this purpose, shall *134 have the right, and when requested by either House of the Legislature it shall be their duty to appear and be heard with respect to any budget bill during the consideration thereof, and to answer inquiries relative thereto.
"Sub-Section CSupplementary Appropriation Bills
"Neither House shall consider other appropriations until the budget bill has been finally acted upon by both Houses, and no such other appropriations shall be valid except in accordance with the provisions following:
"(1) Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called herein a supplementary appropriation bill; (2) Each supplementary appropriation bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be laid and collected as shall be directed in said bill unless it appears from such budget that there is sufficient revenue available; (3) No supplementary appropriation bill shall become a law unless it be passed in each house by a vote of a majority of the members present, and the years and nays recorded on its final passage. Each supplementary appropriation bill shall be presented to the governor of the State as provided in section fourteen of article seven of the Constitution and thereafter all the provisions of said section shall apply.
"Nothing in this amendment shall be construed as preventing the Legislature from passing in time of war an appropriation bill to provide for the payment of any obligation of the State of West Virginia within the protection of section ten of article one of the Constitution of the United States.
"Sub-Section DGeneral Provisions

"First: If the `Budget Bill' shall not have been finally acted upon by the Legislature three days before the expiration of its regular session, the governor may, and it shall be his duty to issue a proclamation extending the session for such further period as may, in his judgment, be necessary for the passage of such bill; but no other matter than such bill shall be considered during such extended session except a provision for the cost thereof.

"Second: The board of public works for the purpose of making up its budgets shall have the power, and it shall be its duty, to require from the proper State officials, including herein all executive departments, all executive and administrative officers, bureaus, boards, commissions and agencies expending or supervising the expenditure of, and all institutions applying for state moneys and appropriations, such itemized estimates and other information, in such form and at such times as said board shall direct. The estimates for the legislative department, certified by the presiding officer of each House, of the judiciary, as provided by law, certified by the auditor, and for the public schools, as provided by law, shall be transmitted to the board of public works, in such form and at such time as it shall direct, and shall be included in the budget.
"The board of public works may provide for public hearings on all estimates and may require the attendance at such hearings of representatives of all agencies, and all institutions applying for state moneys. After such public hearings it may, in its discretion, revise all estimates except those for the legislative and judiciary departments, and for the public schools as provided by law.
"Third: The Legislature may, from time to time, enact such laws, not inconsistent with this section, as may be necessary and proper to carry out its provisions.
"Fourth: In the event of any inconsistency between any of the provisions of this section and any of the *135 other provisions of the Constitution, except amendments thereto heretofore made and ratified by the people, the provisions of this section shall prevail. But nothing herein shall be construed as preventing the governor from calling extraordinary sessions of the Legislature, as provided by section seven of article seven, or as preventing the Legislature at such extraordinary sessions from considering any emergency appropriation or appropriations.
"If any item of any appropriation bill passed under the provisions of this section shall be held invalid upon any ground, such invalidity shall not affect the legality of the bill or of any other item of such bill or bills."
The basic issues are: (1) Is the budget act unconstitutional in its entirety because it appropriates for the 1953-55 biennium the amount of $1,595,176.25 in excess of the estimate contained in the budget bill, and therefore creates a deficit inhibited by Section 51 of Article VI of the Constitution of West Virginia; (2) is the budget act unconstitutional only to the extent that it amended the budget bill by increasing items other than those relating to the Legislature and the judiciary, including the item in the amount of $24,017.48 contained in the requisition to the respondent, and upon which this proceeding is primarily based; (3) is the budget act in its entirety unconstitutional because the amendments made by the budget act to the budget bill, consisting of increases in items contained in the bill and the incorporation in the act of new items, are numerous and extensive; and (4) is the budget act unconstitutional in that it amended the budget by diminishing items relating to the judiciary?
The overall and controlling question is: Does Section 51 of Article VI of the Constitution of West Virginia vest in the Board of Public Works the right to estimate the unencumbered balance as of July 1 of the ensuing biennium, and estimate the receipts for the fiscal years of the ensuing biennium, and prepare budgets and a budget bill based upon that estimate, exclusive of any legislative finding contrariwise?
If this question is answered in the affirmative, this case revolves upon what the Attorney General and counsel for the petitioners term the "heart" of Section 51, which reads: "The Legislature shall not amend the budget bill so as to create a deficit but may amend the bill by increasing or diminishing the items therein relating to the Legislature, and by increasing the items therein relating to the judiciary, but except as hereinbefore specified, may not alter the said bill except to strike out or reduce items therein; * * *".
If Section 51, Article VI, West Virginia Constitution is clear in its terms, so that its interpretation is within the grasp of any reasonable mind, and the intent of the electorate is clearly expressed in the language of the provision itself, there is no room for judicial construction, and this Court must apply and not interpret the amendment. May v. Topping, 65 W.Va. 656, 64 S.E. 848; Blumberg v. Snyder, 90 W.Va. 145, 148, 110 S.E. 544; State v. Conley, 118 W.Va. 508, 524, 525, 190 S.E. 908; Roanoke v. James W. Michael's Bakery Corp., 180 Va. 132, 21 S.E.2d 788; Cooke v. Iverson, 108 Minn. 388, 122 N.W. 251, 52 L.R.A.,N.S., 415; State ex rel. Summerfield v. Clarke, 21 Nev. 333, 31 P. 545, 13 L.R.A. 313, 37 Am.St.Rep. 517; State v. Rose, 89 Ohio St. 383, 106 N.E. 50, L.R.A.1915A, 256; 4 M.J., Constitutional Law, Section 7; 11 Am.Jur., Constitutional Law, Section 64.
If the controlling question is answered in the affirmative and the provisions of the "heart" of Section 51 are mandatory, then the budget act is unconstitutional, not only as to the specific item in the amount of $24,017.48, but as to any new items not concerned with the legislative or judicial departments of government, and as to any and all increases in items, other than those relating to the Legislature and judiciary over the amounts of the items contained in the budget bill, but the budget act is unconstitutional in its entirety because, as counsel for the petitioners and the Attorney General *136 agree, and as this record clearly shows, if the sole and exclusive right to prepare budgets for the biennium 1953-55, and to make estimates of revenues available for appropriation for those fiscal years is vested in the Board of Public Works, exclusive of legislative control, there is a deficit created by the budget act in the amount of $1,595,176.25, being the difference between $192,766,000.09, the total appropriations from the general revenue fund embraced in the budget act, and $191,170,823.84, the total amount available for appropriation by the 1953 Legislature, as shown by the budgets and estimates prepared by the Board of Public Works, and the budget bill submitted by the board in conformity with Section 51 of Article VI of the Constitution of West Virginia to the presiding officers of both Houses of the Legislature.
In our opinion, Section 51 of Article VI of the Constitution of this State speaks in authoritative and mandatory terms, and necessarily so, because it represents the voice of the electorate of this State in telling the legislative branch thereof how the public funds derived from the taxpayers of this State are to be appropriated. Authoritatively the first provision of Section 51 of Article VI of the Constitution reads: "The Legislature shall not appropriate any money out of the treasury except in accordance with the following provisions"; and the following section, Sub-Section A, in an equally authoritative tone reads: "Every appropriation bill shall be either a budget bill, or a supplementary appropriation bill, as hereinafter mentioned." Section First of Sub-Section B provides that: "Within ten days after the convening of the Legislature, unless such time shall be extended by the Legislature for the sessions at which the budget is to be submitted, the board of public works, * * * shall submit to the Legislature, two budgets, one for each of the ensuing fiscal years * * *"; and section Third of Sub-Section B, in equally authoritative terms provides that: "The board of public works shall deliver to the presiding officer of each House the budgets and a bill for all the proposed appropriations of the budgets clearly itemized and classified".
As used in statutes, contracts, or in constitutional provisions, the word "shall" is used generally in an imperative or mandatory sense. Black's Law Dict., 4th ed., 1541; Baer v. Gore, 79 W.Va. 50, 90 S.E. 530, 531, L.R.A.1917B, 723. In People v. O'Rourke, 124 Cal.App. 752, 13 P.2d 989, 992, the District Court of Appeal, Third Dist. Cal., quoted with approval the apt, strong and clear language contained in 57 C.J., at page 548: "In common, or ordinary parlance, and in its ordinary signification, the term `shall' is a word of command, and one which has always, or which must be given a compulsory meaning; as denoting obligation. It has a peremptory meaning, and it is generally imperative or mandatory. It has the invariable significance of excluding the idea of discretion, and has the significance of operating to impose a duty which may be enforced, particularly if public policy is in favor of this meaning or when addressed to public officials, or where a public interest is involved, or where the public or persons have rights which ought to be exercised or enforced, unless a contrary intent appears; but the context ought to be very strongly persuasive before it is softened into a mere permission * * *." See, also, 80 C.J.S., page 136.
Particularly, in the interpretation of constitutional provisions, especially where, as in the instant case, the provision concerns the public interest or a general public policy, the word "shall" should be held imperative or mandatory. Bachrach v. Nelson, 349 Ill. 579, 182 N.E. 909; State ex rel. Gouge v. Burrow, 119 Tenn. 376, 104 S.W. 526, 14 Ann.Cas. 809; Home Telephone Co. v. City of Nashville, 118 Tenn. 1, 101 S.W. 770, 11 Ann.Cas. 829; Biggs v. Beeler, 180 Tenn. 198, 173 S.W.2d 144, 946, 153 A.L.R. 510; Coleman v. Town of Eutaw, 157 Ala. 327, 47 So. 703; People ex rel. Smith v. St. Lawrence County Supervisors, 90 Hun 568, 36 N.Y.S. 40; State v. Johnson, 26 Ark. 281; State v. Alden Mills, 202 La. 416, 12 So.2d 204.
*137 In Baer v. Gore, 79 W.Va. 50, 52, 90 S.E. 530, 531, L.R.A.1917B, 723, this Court said: "Generally `shall', when used in constitutions and statutes, leaves no way open for the substitution of discretion."
The word "shall" as embraced in Sub-Section A and the section First of Sub-Section B, of Section 51 of Article VI of the West Virginia Constitution, should, in our opinion, be read as mandatory. As stated by the Supreme Court of Washington in Bronson v. Syverson, 88 Wash. 264, 152 P. 1039, 1043, L.R.A.1916B, 993, Ann. Cas.1917D, 833: "It is a cardinal rule of construction that the language of a state Constitution, more than that of any other of the written laws, is to be taken in its general and ordinary sense." The Washington Court quotes from 1 Story Constitution Section 451: "The people make them [the Constitutions], the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss."
Sub-Section A, in our opinion, prohibits the Legislature from making an appropriation except by a budget bill, and if necessary a supplementary appropriation bill, or bills; and section First of Sub-Section B imposes upon the Board of Public Works the mandatory duty to prepare and submit to the Legislature two budgets, one for each of the ensuing fiscal years, and deliver the budgets, together with a budget bill for all of the proposed appropriations of the budgets clearly itemized and classified, and its duty in this regard is beyond any legislative control, except as provided in the "heart" of the budget amendment.
Likewise we are of opinion that the words "shall not", as used in the first paragraph of the budget amendment, should be given their general and ordinary meaning, and that section of the budget amendment should be interpreted to read as prohibiting the Legislature from appropriating any money out of the treasury, except in accordance with the provisions of the budget amendment, In People v. Tremaine, Comptroller, 257 App.Div. 117, 13 N.Y.S.2d 125, 127, affirmed in 281 N.Y. 1, 21 N.E.2d 891, the Court of Appeals of New York interpreted a provision of the budget amendment of the New York Constitution, which read, in part: "The legislature may not alter an appropriation bill submitted by the governor except to strike out or reduce items therein, but it may add thereto items of appropriation * * *", art. 7, § 4, to mean that the Legislature, subject to certain exceptions contained in the Constitution, is prohibited from altering any appropriation bill submitted by the governor. It is to be noted that the New York Court had under consideration a constitutional clause in which the words "may not" were employed; whereas the words "shall not", used in the first paragraph of the budget amendment of the Constitution of West Virginia, are stronger in a prohibitory sense than those considered by the New York Court.
As the words "Neither House shall consider other appropriations until the budget bill has been finally acted upon by both Houses", contained in Sub-Section CSupplementary Appropriation Bills of the budget amendment mean that the Houses of the Legislature "shall not consider other appropriations until the budget bill has been finally acted upon by both Houses", this clause should be read, as we have heretofore read the words "shall not" in the first paragraph of the budget amendment. We are therefore of opinion that Sub-Section CSupplementary Appropriation Bills prohibits the Legislature from considering other appropriations until the budget bill has been finally acted upon. In reading the words "shall not" and "Neither House shall" as restricting the actions of the Legislature, and giving to those words their literal and natural interpretation, we have not overlooked an underlying and cardinal rule of construction as applied to a written Constitution, that is, "The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it". Volume 1, Carrington Cooley's Constitutional Limitations, 8th ed., 124.
*138 The "heart" of the budget amendment contained in section Third of Sub-Section B, which provides, in part: "The Legislature shall not amend the budget bill so as to create a deficit * * *," to a large extent controls the decision of this case. It presents a clear mandate from the electorate of this State that in no circumstances shall the Legislature amend a budget bill submitted to it by the Board of Public Works so as to create a deficit. That the prevention of a deficit in the State treasury was the prime purpose for which the budget amendment was submitted to the voters of West Virginia and ratified by them appears from the history of that amendment.
In the Journal of the State Senate, Regular Session, 1917, at page 22, appears a letter addressed by Governor-elect John J. Cornwell to Senator G. K. Kump of Hampshire County. A like letter was addressed to Honorable James W. Weir, a member of the House of Delegates from Randolph County, by the Governor-elect, as appears from the Journal of the House of Delegates, Regular Session, 1917. In these letters addressed to these distinguished members of the Senate and House of Delegates of the 1917 Legislature, the Governor-elect urged that an act be passed submitting to the electorate a budget amendment, in which letters Governor-elect Cornwell stated: "* * * there is no question about the advisability of a constitutional prohibition against the legislature's making appropriations that will cause a deficit in the treasury. The State should `pay as it goes'".
A short time before the ratification of the instant budget amendment, the State of Maryland, acting on the advice of a commission, headed by Dr. Goodnow, then President of Johns Hopkins University, had adopted a similar budget amendment, except that it charged the Governor of the State of Maryland with the duty and vested in him the power to prepare budgets and a budget bill, instead of some governmental body like the Board of Public Works, as in the instant case.
Because Section 51 of Article VI of the West Virginia Constitution, which is designated in the Constitution of this State as "The Budget System", was based upon a budget amendment first adopted by the State of Maryland primarily for the purpose of prohibiting the amendment of a budget bill so as to create a deficit, this Court regards as most persuasive the decisions of the Court of Appeals of Maryland in appraising the budget amendment in the cases of Baltimore v. O'Conor, 147 Md. 639. 648-651, 128 A. 759, 40 A.L.R. 1058, and Dorsey v. Petrott, 178 Md. 230, 13 A.2d 630, in which the Court of Appeals of Maryland held that the provisions of the budget amendment of the State of Maryland regulating the manner in which public money may be expended are mandatory as controlling against the Assembly of the State of Maryland, as well as the Governor of that State, who is vested with the power to prepare the budgets and submit to the Assembly of Maryland a budget bill, just as in the instant case the Board of Public Works is vested with that power and duty.
Under our holding, as heretofore stated, the budget amendment vested in the Board of Public Works, exclusive of legislative control, except as provided in the "heart" of the budget amendment, the right to prepare budgets and a budget bill for each ensuing biennium. The overall purpose of the budget amendment was to direct the Legislature in making appropriations so as to prevent a deficit.
The Legislature by the enactment of the budget act amended the budget bill by appropriating $192,766,000.09, or an excess of $1,595,176.25 over the amount of $191,170,823.84, found by the Board of Public Works to be available for appropriation. Under our holding, as hereinbefore stated, that the budget amendment vested in the Board of Public Works, exclusive of legislative control, except as provided in the "heart" of the budget amendment, the right to prepare budgets and a budget bill for the ensuing biennium, the budget act created an unconstitutional deficit which renders the act unconstitutional in its entirety.
*139 As this case is controlled by the application of constitutional provisions, the finding of the Legislature at its 1953 session by the amendment of the budget bill that: "The Legislature finds that the estimates of the funds in the treasury at the time this act is enacted and expected revenues to accrue prior to July 1, 1953, and during the biennium 1953-55, will furnish funds to pay" the expenses of State Government and provide for interest and principal on the debts of the State, is of no moment.
We are of opinion, and so hold, that all of the items in the budget act, considered separately, embracing increases of items other than those relating to the Legislature or judiciary, decreases relating to the Supreme Court of Appeals and the State Law Library, an adjunct of the Court, and new items incorporated in the budget act by the amendment of the budget bill, are unconstitutional. The unconstitutionality of these items appears clearly from the "heart" of the budget amendment contained in section Third of Sub-Section B. This provision of the budget amendment provides in prohibitory language that "The Legislature shall not amend the budget bill so as to create a deficit, * * * ". Then by way of exceptions to this general rule, it is provided that "but [the Legislature] may amend the bill by increasing or diminishing the items therein relating to the Legislature, and by increasing the items therein relating to the judiciary, but except as hereinbefore specified, may not alter the said bill except to strike out or reduce items therein; * * *." We think that the words "shall not", appearing in the provision "The Legislature shall not amend the budget bill so as to create a deficit", and the word "may", appearing in the exceptions to this general provision, were used advisedly by the framers of the budget amendment and by the Legislature in submitting the amendment to a vote of the electorate. In constitutional provisions the word "may" generally should be read as both permission and power. State ex rel. Langer v. Hall, 44 N.D. 536, 173 N.W. 763; State v. McIntyre, 92 Utah 177, 66 P.2d 879; State v. Reeves, 112 S.C. 383, 99 S.E. 841; State ex rel. v. Henry, 87 Miss. 125, 40 So. 152, 154, 158, 5 L.R.A.,N.S., 340. There are exceptions to this general rule governing the applicability of a constitutional provision: (1) that the word "may" should be read "must" when the intention so requires, Henry v. State, 87 Miss. 1, 39 So. 856, 893; and (2) a fortiori, the rule applicable to statutory construction that "may" should be read as "shall" or "must" where the public or third persons have a claim de jure that the power delegated should be exercised. See Anno. to State of Mississippi ex rel. Greaves, Dist. Atty. v. Henry, Warden of Penitentiary, 87 Miss. 125, 40 So. 152, 5 L.R.A.,N.S., Note 340 to 344, inclusive.
This provision of the budget amendment providing against the creation of a deficit and providing that in certain exceptions the Legislature may amend the budget bill, both by increasing or diminishing the items therein relating to the Legislature, and by increasing the items therein relating to the judiciary, and by the exception which provides that "except as hereinbefore specified [the Legislature], may not alter the said bill except to strike out or reduce items therein * * *", lends itself to the application of the doctrine set forth in the maxim of expressio unius est exclusio alterius. In People v. One 1941 Ford 8 Stake Truck, Engine No. 99T370053, License No. P. 8410, 26 Cal.2d 503, 159 P.2d 641, 642, it was held that if a statute specifies one exception to a general rule, other exceptions or effects are excluded. See Harbert v. County Court of Harrison County, 129 W.Va. 54, 75, 39 S.E.2d 177. In Black's Law Dictionary, 4th Ed. 692, it is stated: "Expression of one thing is the exclusion of another. Co. Litt. 210a; Burgin v. Forbes, 293 Ky. 456, 169 S.W.2d 321, 325; Newblock v. Bowles, 170 Okl. 487, 40 P.2d 1097, 1100. Mention of one thing implies exclusion of another. Fazio v. Pittsburgh Rys. Co., 321 Pa. 7, 182 A. 696, 698; Saslaw v. Weiss, 133 Ohio St. 496, 14 N.E.2d 930, 932. When certain persons or things are specified in a law, contract, or will, an intention to exclude *140 all others from its operation may be inferred. Little v. Town of Conway, 171 S.C. 27, 170 S.E. 447, 448." As by way of exception and in detail, the "heart" of the budget amendment, contained in section Third, Sub-Section B, provides that the Legislature may increase or decrease items relating to the Legislature and increase items relating to the judiciary, and may not "except as hereinbefore specified," alter the budget bill "except to strike out or reduce items therein", the Legislature, in our opinion, has the express power to effectuate such increases and decreases; but as the amendment provided the Legislature may increase items relating to the judiciary and is silent on the question whether items relating to the judiciary may be decreased, and provided that "except as hereinbefore specified", the Legislature is empowered to strike out or reduce items in the budget bill, it is our opinion that the Legislature may amend a budget bill submitted to it by the Board of Public Works by increasing or diminishing the items relating to the Legislature, and by increasing the items relating to the judiciary, but may not otherwise amend the bill, except to strike out or reduce items therein.
We are of opinion, and so hold, that all of the items in the budget act, considered separately, embracing increases and the incorporation of new items, other than those relating to the Legislature and the judiciary, and decreases in items relating to the judiciary, by the amendment of the budget bill, are unconstitutional.
A comparison of the budget bill submitted to the Legislature by the Board of Public Works with the budget act, under consideration, discloses that in twenty-five separate instances the bill was amended by increasing items, other than those relating to the Legislature and the judiciary; that it was amended by incorporating in the budget act forty-four entirely new items, other than those relating to the Legislature and the judiciary; and that it was amended by decreasing items relating to the Supreme Court of Appeals and the State Law Library, all of which was in violation of the provisions of the "heart" of the budget amendment. The Attorney General asserts that the unconstitutional amendments to the budget bill are so numerous and extensive that if they were stricken from the act on the basis of their unconstitutionality there would result a budget act not intended to be enacted by the Legislature, and for that reason the budget act is unconstitutional in its entirety.
However, counsel for petitioners, relying on the saving clauses contained in the budget amendment and in the budget act, counter that if the unconstitutional items are stricken from the budget act, the saving clauses will serve to save the constitutional parts of the act.
The saving clause contained in section Fourth of Sub-Section DGeneral Provisions of the budget amendment reads:
"If any item of any appropriation bill passed under the provisions of this section shall be held invalid upon any ground, such invalidity shall not affect the legality of the bill or of any other item of such bill or bills."
The saving clause contained in Section 7 of the budget act reads:
"If any part of this act is declared unconstitutional by a court of competent jurisdiction, its decision shall not affect any portion of this act which remains, but the remaining portions shall be in full force and effect as if the portion declared unconstitutional had never been a part of the act."
It is axiomatic in the law of constitutional and statutory construction that a saving clause is merely an aid to the interpretation of a constitution or statute, and will not be held to operate so as to thwart the intent of the electorate in the case of the interpretation of a constitution, or the legislative intent in the construction of a statute. The rule applicable to the interpretation of a statute is stated in 11 Am.Jur., Constitutional Law, Section 156, in the following apt language: "The saving clause is not absolute, for the reason *141 that it is merely an aid to interpretation, and not an inexorable command. It is to be given a reasonable interpretation and does not operate to save provisions which clearly would not have been inserted except upon the supposition that the entire act was valid. The courts have steadfastly declared that the presumption so created is rebuttable although it must be overcome by considerations which make evident the inseparability of the provisions or the clear probability that, the invalid part being eliminated, the legislature would not have been satisfied with what remained, in order to defeat the entire act. When the presumption of separability which is created by such a provision in a statute is overcome by a showing of the indivisible character of the act in spite of the provision, the entire act must fall with any invalid portion." In Hodges v. Public Service Commission, 110 W.Va. 649, 159 S.E. 834, 837, this Court, speaking through Judge Hatcher, succinctly stated the rule: "* * The law is settled that if the elimination of unconstitutional portions of an enactment would cause a result materially different from the legislative intention, as in this instance, then the unconstitutional portions are not separable and the entire act must be held inoperative." This Court in Lingamfelter v. Brown, 132 W.Va. 566, pts. 3 and 4 syl., 52 S.E.2d 687, in interpreting Chapter 5, Acts of the Legislature, Regular Session, 1947, creating the West Virginia State Apple Commission, and prescribing its powers and duties, held that the saving clause, contained in the statute, did not serve to save the constitutional parts of the statute, where the controlling part of the statute was held unconstitutional.
The unconstitutional items in the budget act, consisting of decreased items relating to the judiciary, increased items, other than those relating to Legislature and judiciary, and the incorporation of the new items, are so numerous and extensive that, in our opinion, if they were stricken from the act the result would be an act decidedly different from that which the Legislature intended. To permit this would be tantamount to an encroachment upon the exclusive right of the Legislature under Section 3 of Article X of the West Virginia Constitution to appropriate money for State purposes, and under Section 5 of Article X of the West Virginia Constitution to levy taxes for State purposes.
It follows as a corollary that the budget act, even in the absence of a deficit, is unconstitutional in its entirety.
In our opinion the foregoing disposes of the controlling questions in this case, but before closing this opinion we shall, as we should, address ourselves to the several interesting questions raised by counsel for petitioners in their able argument and brief.
It is argued by counsel for the petitioners that a budget act can never be an act creating a deficit in violation of the "heart" of the budget amendment because: (1) Under Section 35, Chapter 39, Acts of the Legislature, Regular Session, 1939, it is provided: "General Fund; Pro Rata Reductions. If the board [Board of Public Works] determines that the amounts, or parts thereof, appropriated from the general revenue cannot be expended without creating an overdraft or a deficit in the general fund, it may instruct the director [Director of the Budget] to reduce equally and pro rata all appropriations out of general revenue in such a degree as may be necessary to prevent an overdraft or a deficit in the general fund"; and (2) Under Section 13, Chapter 50, Acts of the Legislature, Regular Session, 1949, it is provided:
"13. Revenue Deficiencies.If at any time deficiencies in the revenue reduce amounts available for state aid below the amount of appropriations made by the Legislature for any fiscal year, or if the amount appropriated by the Legislature for any fiscal year is insufficient to meet in full the requirements for that year of the distribution formula prescribed in this article, and it becomes necessary for the state board [The State Board of School Finance] to reduce the amount *142 of state aid it shall make reductions for each county as follows:
"(1) Fifty per cent of the total reductions shall apply proportionately to the adjustment made for each county adjusted, and
"(2) The remaining fifty per cent of the deficiencies shall be applied as a uniform percentage reduction of the foundation program for each county."
On the basis of the foregoing it is reasoned that the Legislature has, in effect, insured compliance with the constitutional mandate that the budget act cannot create a deficit. In all deference to distinguished counsel for petitioners, this is a non sequitur. The major premise of counsel's syllogism, in our opinion, is unsound. That premise assumes that the Legislature can enact a budget act, which creates a deficit in violation of Section 51 of Article VI of the West Virginia Constitution, and provide in futuro by independent legislation for the elimination of an unconstitutional deficit originally created. The budget amendment inveighs against the creation of a deficit in the first instance, and that postulate affords no leeway for the creation of a deficit by the enactment of a budget act, and thereafter the elimination of a deficit by the action of an administrative body.
Counsel for petitioners further argue that the budget act is not a deficit act, in that the Budget Document, covering the 1953-55 biennium, shows an estimated amount of approximately fourteen million dollars which will constitute a surplus in the treasury as of June 30, 1953. True, the Budget Document in Statement II thereof contains an entry "Estimated Unencumbered Balance as of July 1, 1953, (See Statement I) . . . $14,259,444.93". But counsel for the petitioners and the Attorney General on oral argument have agreed that the "Financial Statement State Fund General Revenue Projected to June 30, 1955", contained in Appendix A of the respondent's brief, is substantially correct. This statement shows that the current biennial funds available for new appropriations, which will constitute a surplus in the State Treasury as of June 30, 1953, amount to $15,660,823.84. This amount was taken into consideration by this Court in arriving at its conclusion that the budget act created a deficit in the amount of the difference between the total amount of the appropriations contained in the budget act and the total amount of funds estimated by the Board of Public Works to be available for appropriation by the 1953 Legislature.
The budget amendment contained in Section 51 of Article VI of the West Virginia Constitution does not, as counsel for the petitioners assert, take from the Legislature the power delegated to it under Sections 3 and 5 of Article X of the Constitution to appropriate money and levy taxes for State purposes. That power, notwithstanding the provisions of Section 51, is still vested in the Legislature. Section 51 simply provides a direction as to how the appropriation shall be made, and constitutes a limited executive restraint upon the unbridled power of the Legislature in making appropriations which will create a deficit. If on the consideration of a budget bill, it should appear that the budget bill does not provide for sufficient appropriations to maintain the public schools, the road system of the State, the eleemosynary and educational institutions of the State, the rendition of necessary public services, and all other proper subjects requiring the appropriation of public funds, it then becomes the duty of the Legislature to enact a constitutional budget bill in conformity with Section 51 of Article VI of the West Virginia Constitution, and thereafter and at the same session provide for sufficient appropriations under Sub-Section CSupplementary Appropriation Bills, of Section 51, Article VI, of the West Virginia Constitution. Sub-Section C provides:
"Neither House shall consider other appropriations until the budget bill has been finally acted upon by both Houses, *143 and no such other appropriations shall be valid except in accordance with the provisions following:
"(1) Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called herein a supplementary appropriation bill; (2) Each supplementary appropriation bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be laid and collected as shall be directed in said bill unless it appears from such budget that there is sufficient revenue available; (3) No supplementary appropriation bill shall become a law unless it be passed in each house by a vote of a majority of the members present, and the years and nays recorded on its final passage. Each supplementary appropriation bill shall be presented to the governor of the State as provided in section fourteen of article seven of the Constitution and thereafter all the provisions of said section shall apply."
This holding does not confront this Court with the delicate question whether section Fourth of Sub-Section DGeneral Provisions, of Section 51 of Article VI of the West Virginia Constitution, which provides: "In the event of any inconsistency between any of the provisions of this section and any of the other provisions of the Constitution, except amendments thereto heretofore made and ratified by the people, the provisions of this section shall prevail. But nothing herein shall be construed as preventing the governor from calling extraordinary sessions of the Legislature, as provided by section seven of article seven, or as preventing the Legislature at such extraordinary sessions from considering any emergency appropriation or appropriations", serves to take from the Legislature the powers vested in it under Sections 3 and 5 of Article X of the West Virginia Constitution to make appropriations and levy taxes for State purposes.
Counsel for petitioners assert that the Board of Public Works in preparing the budgets for the 1953-55 biennium, and the budget bill, violated the provision of the last paragraph of section Second of Sub-Section DGeneral Provisions of Section 51 of Article VI of the West Virginia Constitution, in that the budgets and the budget bill proposed appropriations for the Department of Education in an amount of approximately six million dollars less than the amount specified in the estimates of the Department of Education.
The Budget Document for the biennium 1953-55, shows in Account No. 295 that the Department of Education requested $48,528,749 for state aid to schools for the fiscal year 1953-54, supplementing the general school fund, and the same amount for the fiscal year 1954-55. As shown by Account No. 297 in the Budget Document for the biennium 1953-55, the Department of Education requested an appropriation for textbooks for schools in the amount of $300,000 for the year 1953-54, and $200,000 for the year 1954-55; and, as shown by the Budget Document for the biennium, the Board of Public Works approved proposed appropriations in the amount of $42,650,000 for the fiscal year 1953-54, and the same amount for the fiscal year 1954-55, and approved proposed appropriations for textbooks for schools in the amount of $200,000 for the year 1953-54, and $150,000 for the year 1954-55.
The approval of these proposed appropriations by the Board of Public Works for the biennium 1953-55 was made after public hearings on the estimates submitted to the board by the Department of Education. Thus it is contended by petitioners that this reduction from the estimates submitted by the Department of Education violated the last sentence of the last paragraph of section Second of Sub-Section DGeneral Provisions, which reads: "* * * After such public hearings it [the Board of Public Works] may, in its discretion, revise all estimates except those for the legislative and judiciary departments, and for the public schools as provided by law." (Italics supplied.) The words "as provided by law", in our opinion, *144 mean the amounts appropriated in the budget act covering the 1951-53 biennium for the Department of Education, state aid to schools, and textbooks for schools. As the amounts approved by the Board of Public Works for state aid to schools supplementing the general school fund for the years 1953-54 and 1954-55 were in the amount of $42,650,000 each, and were in excess of the amounts appropriated by the budget act covering the 1951-53 biennium, that is $42,000,000 and $42,500,000, the revision made by the Board of Public Works of the estimates submitted by the Department of Education for state aid to schools for the biennium 1953-55 did not violate section Second of Sub-Section DGeneral Provisions, of Section 51 of Article VI of the Constitution of this State.
But the Board of Public Works in revising the Department of Education's estimate and request for textbooks for schools, after public hearings, violated the provisions contained in section Second, Sub-Section DGeneral Provisions. For that purpose for the fiscal year 1951-52, the Legislature appropriated $100,000, and for the fiscal year 1952-53, the sum of $200,000. The Board of Public Works revised the estimate of the Department of Education by providing for textbooks for schools the sum of $200,000 for the fiscal year 1953-54, and $150,000 for the fiscal year 1954-55. Though the amount appropriated for the biennium 1951-53 totaled $300,000 and the amount approved by the board for the biennium 1953-55 was $350,000, the Board of Public Works revised the estimate of the Department of Education for the second fiscal year, 1954-55 of the 1953-55 biennium by approving for appropriation the sum of $150,000, which is $50,000 less than the amount of $200,000 appropriated for the second fiscal year, 1952-53, of the 1951-53 biennium. This, in our opinion, was violative of section Second of Sub-Section D General Provisions, because section First, Sub-Section B, provides that the Board of Public Works shall prepare "two budgets, one for each of the ensuing fiscal years", so this provision of the Constitution relating to the preparation of budgets deals with each fiscal year in each biennium. Thus the two budgets are separate and distinct instruments, involving two different years, and as the budget bill provides for appropriations for the second year of the 1953-55 biennium an amount of $50,000 less than that appropriated for the fiscal year 1952-53, the Board of Public Works violated the last paragraph of section Second of Sub-Section DGeneral Provisions, of Section 51 of Article VI of the West Virginia Constitution.
As the budget act provides for an appropriation for textbooks for schools for the fiscal year 1954-55 in the amount of $150,000, the amount approved for that year by the Board of Public Works, the unconstitutional action of the Board of Public Works did not render the appropriation unconstitutional, as under the language of the last paragraph of section Third of Sub-Section B of the budget amendment the Legislature may amend the budget bill by increasing or decreasing items relating to the Legislature, by increasing items relating to the judiciary, and may not otherwise amend the bill except to strike out or reduce items therein.
Counsel for petitioners argued with earnestness and sincerity that the Board of Public Works acted in a capricious, arbitrary and uncooperative manner in (1) cutting the estimates of the Department of Education for each fiscal year in the 1953-55 biennium from $48,528,749 for each fiscal year to $42,650,000 for each fiscal year; and (2) with full knowledge of the increased costs which will be attendant upon state aid to schools under the proposed new formula, it refused to revise its estimate at the request of the Chairman of the Finance Committees of the Senate and House of Delegates, in their letter of March 14, 1953, though the letter informed the Board of Public Works of expected new sources of revenue to be derived from the State Racing Commission and the West Virginia State Liquor Commission in the amount of approximately one million dollars for each fiscal year of the 1953-55 biennium.
*145 Counsel for petitioners assert in their brief that: "With one party to the `Budget System' refusing to perform its duty, it was incumbent upon the other partythe Legislatureto proceed to the best of its ability to perform its duty along the only lines left open to it and provide funds so that the schools and the governmental agencies of the State could proceed to function. This the Legislature did by enacting into law Committee Substitute for Senate Bill No. 1." With this position we do not agree. In view of the explanation contained in the letter of the Board of Public Works to the presiding officers of both Houses concerning possible decreased revenue due to diminishing returns from the West Virginia State Liquor Control Commission and the poor economic status of the coal industry in this State, we cannot say that the Board of Public Works was derelict in its duty in revising the estimates submitted by the Department of Education for state aid to public schools vested in it by the last sentence of section Second of Sub-Section DGeneral Provisions of the budget amendment, which provides that after public hearings the board "may, in its discretion, revise all estimates except those for the legislative and judiciary departments, and for the public schools as provided by law." (Italics supplied.)
Likewise it is our opinion that under section Third of Sub-Section B of the budget amendment, the Board of Public Works had the discretion, a discretion which this Court cannot control, "before final action thereon by the Legislature [to] amend or supplement either of said budgets to correct an oversight * * *". We should take as true the statement contained in the letter of the Board of Public Works as to the impending decreases in the State revenues from West Virginia State Liquor Control Commission and as a result of the poor economic condition of the coal industry. This Court cannot, in the absence of a showing contrariwise, say that the Board of Public Works in refusing the requests of the Chairmen of the two Finance Committees acted in capricious, arbitrary and uncooperative manner, and based its refusal of the request upon a false statement. There is no denial in this record of the statement contained in the letter of the Chairmen of the two Finance Committees of March 14, 1953, to the Board of Public Works, and neither is there any denial in this record of the statement contained in the letter of the Board of Public Works.
We are therefore not at liberty to say that the Board of Public Works acted in a capricious, arbitrary and uncooperative manner either in refusing to accept and approve the estimate submitted to it by the Department of Education or in refusing to amend and supplement the two budgets submitted to the Legislature as the chairmen requested in their letter of March 14, 1953.
Counsel for petitioners start with the premise that Section 1, Article XII of the West Virginia Constitution, which reads: "The Legislature shall provide, by general law, for a thorough and efficient system of free schools", vests "full, complete and plenary power in the Legislature to provide for the public schools". From this premise it is argued that the effect of the constitutional provision contained in section Second of Sub-Section DGeneral Provisions, that all estimates presented to the Board of Public Works by the Department of Education "of what is required for the support of the public schools as provided by law" is self-enacting so far as the Board of Public Works is concerned. In support of this position counsel cite Thorne v. City of Clarksburg, 88 W.Va. 251, 255, 106 S.E. 644, and 42 Am.Jur., Public Funds, Section 42.
In the first place we are of opinion that while Section 1 of Article XII of the Constitution imposes on the Legislature the duty and vests in it the power "by general law" to provide for a thorough and efficient system of free schools, it is not selfenacting, and neither, in our opinion, is section Second of Sub-section D of Section 51 of Article VI of the State Constitution, so far as the Board of Public Works is concerned. Whether a constitutional provision is self-enacting is well stated in *146 point 2 of the syllabus of Thorne v. City of Clarksburg, supra, in the following language: "The principal test for determining whether a constitutional provision is self-executing is that the right it gives or the duty it imposes may be enforced without the aid of legislative enactment."
That a constitutional provision may, in some instances, constitute an appropriation is well settled. 42 Am.Jur., Public Funds, Section 42. See also State ex rel. Rotwitt v. Hickman, 9 Mont. 370, 23 P. 740, 8 L.R.A. 403; Riley v. Carter, 165 Okl. 262, 25 P.2d 666, 88 A.L.R. 1018; State ex rel. Henderson v. Burdick, 4 Wyo. 272, 33 P. 125, 24 L.R.A. 266; and Reed v. Houston, 24 Idaho 26, 132 P. 109, Ann.Cas.1915A, 1237; and the illuminating note to Riley v. Carter contained in 88 A.L.R. at pages 1054-1057, inclusive. As Article XII of the Constitution specifically provides that the Legislature shall "by general law" provide for a thorough and efficient system of free schools, and contains no definite amount or amounts to be appropriated for the maintenance of the public school system, it does not constitute an appropriation. Moreover, the budget amendment, Section 51 of Article VI of the West Virginia Constitution, as heretofore indicated, provides, specifically, and in prohibitory terms that "The Legislature shall not appropriate any money out of the treasury except in accordance with the following provisions:".
If there is any conflict between Section 51 of Article VI and Section 1 of Article XII of the West Virginia Constitution, the conflict must be resolved under the provisions of section Fourth of Sub-Section D General Provisions of Section 51, which reads: "In the event of any inconsistency between any of the provisions of this section and any of the other provisions of the Constitution, except amendments thereto heretofore made and ratified by the people, the provisions of this section shall prevail. But nothing herein shall be construed as preventing the governor from calling extraordinary sessions of the Legislature, as provided by section seven of article seven, or as preventing the Legislature at such extraordinary session from considering any emergency appropriation or appropriations." It is true that Section 1 of Article XII imposes on the Legislature the duty to provide for the public school system, but appropriations therefor must be made only by a constitutional budget act and, if the Legislature should deem it necessary, by a supplementary appropriation bill or bills, as provided in the budget amendment. It cannot be true, as counsel for the petitioners contend, that the effect of section Second of Sub-Section DGeneral Provisions of Section 51 of Article VI of the West Virginia Constitution is "that all estimates of what is required for the support of the public schools as provided by law are self-enacting so far as the Board of Public Works is concerned."
The first provision of Section 51 of Article VI of the West Virginia Constitution inhibits the Legislature from appropriating public money, except as provided by the budget amendment, that is by a budget act or supplementary appropriation act, as provided by Sub-Section CSupplementary Appropriation bills.
We simply hold that under Section 1 of Article XII of the West Virginia Constitution, there is an absolute and mandatory duty on the part of the Legislature to "provide, by general law, for a thorough and efficient system of free schools", but such appropriation shall be made only in conformity with Section 51 of Article VI of the West Virginia Constitution. The mandate of the electorate of this State, contained in Section 1 of Article XII of the West Virginia Constitution stands no higher than the mandate of the electorate in Section 51 of Article VI of that Constitution.
The budget amendment contained in Section 51 of Article VI of the West Virginia Constitution is couched in plain and clear language. It is an example of superb constitutional drafting, and the prohibitory, permissive and mandatory words used throughout the amendment were advisedly used. It stands as a monument to Ex-Governor John J. Cornwell and the other distinguished West Virginia public officials who drafted it, and caused it to be submitted *147 to the electorate of this State at the election in 1918; and it constitutes a mandate of the electorate binding on all three branches of the State Government, a mandate which was later re-expressed on three occasions, when at the general elections held in the years 1926, 1930 and 1940, amendments to the budget amendment were submitted to the electorate and rejected by the voters. Chapter 58, Acts of the Legislature, Regular Session, 1925; Chapter 21, Acts of the Legislature, Regular and Extended Session, 1929; and Chapter 14, Acts of the Legislature, Regular Session, 1939.
For the foregoing reasons it is the holding of this Court that: (1) The budget act is unconstitutional in its entirety, because it creates a deficit in contravention of Section 51 of Article VI of the West Virginia Constitution; (2) the items in the budget act, including the item upon which this proceeding is based, consisting of decreases in items relating to the judiciary and increases in items other than those relating to the Legislature and the judiciary, and new items incorporated in the act are all unconstitutional; (3) the budget act is unconstitutional in its entirety because the unconstitutional items, consisting of decreases relating to the judiciary and increases in items other than those relating to the Legislature and the judiciary and new items incorporated therein are numerous and extensive and run throughout the entire act, and if these items were stricken from the act on the basis of their unconstitutionality, the budget act would not be the one which the Legislature intended to enact; and (4) the new items incorporated in the act, based on the findings of the Court of Claims are unconstitutional, but as this holding is based solely on the fact that these items are incorporated in the budget act, it does not affect the integrity of the acts themselves.
In so holding this Court does not impugn the motives of any members of the Senate or the House of Delegates. We simply say that it is the constitutional duty of the Court to declare void any act of the Legislature, notwithstanding that the act was enacted with the best of motives and in the interest of good government, if such act clearly violates a provision of the West Virginia Constitution. As stated in the last point of the syllabus of the case of Baltimore v. O'Conor, supra: "The obligation of declaring void a statute which plainly contravenes a provision of the Constitution is not less imperative because the statute embodies wise and beneficient legislation."
We therefore deny the prayer of the petition, and refuse the writ of mandamus prayed for.
Writ refused.
LOVINS and BROWNING, JJ., concur in result.
BROWNING, Judge (concurring).
This Court has unanimously agreed that the writ of mandamus prayed for herein should be refused, and there was complete agreement also upon the four reasons assigned in the opinion for the holding of the Court upon that question. The Court's opinion, after stating that "the foregoing disposes of the controlling questions in this case", proceeded to discuss several other questions raised by counsel which I do not believe necessary to the decision in this case, but there is only one about which I am concerned.
Counsel for relator maintained that the estimates for public schools submitted to the Board of Public Works were self-enacting under the provisions of the second paragraph of Article VI, Section Second, Sub-Section D, of the Constitution of this State, hereinafter referred to as Paragraph Two, and the Court agreed that this contention was erroneous. However, although it was not necessary to do so, the Court's opinion proceeded to interpret Paragraph Two, and in so doing they have adopted a construction thereof with which I am in complete disagreement. This concurring opinion is directed solely to the interpretation of that part of the Constitution, and particularly to the last four words of Paragraph Two. It is here quoted, with *148 the four words italicized: "The board of public works may provide for public hearings on all estimates and may require the attendance at such hearings of representatives of all agencies, and all institutions applying for state moneys. After such public hearings it may, in its discretion, revise all estimates except those for the legislative and judiciary departments, and for the public schools as provided by law." The Court's opinion specifically holds that the words "as provided by law" mean the amounts appropriated in the Budget Act covering the 1951-53 biennium for the Department of Education, State aid to Schools, and free text books for schools.
The Court's opinion refers to the Goodnow Report upon which the Budget Amendment to the Maryland Constitution was based, the latter being almost identical with ours. It is interesting to note that this report, submitted to the Maryland Legislature by the Governor of that state, approximately a year and a half before a similar resolution was adopted by our Legislature, contained this paragraph: "It is further to be noted that the Commission has felt that the separation of the three great departments of government, which is such a characteristic feature of American political organization, makes it desirable to treat the estimates for the legislative and judiciary departments differently from the other estimates. The estimates for the Legislature and judiciary are not to be subject to the revisory powers of the Governor. Those for the Legislature and judiciary are to be certified to the Governor, and are to be transmitted by him without revision to the Legislature. The estimates of the judiciary as provided by law are to be certified by the Comptroller, and the Legislature may increase them, but not reduce them. The effect of this method of treating the estimates for the judiciary will be that no reduction in the provision made by the law for the judiciary may be made in an Appropriation Act. The Legislature may, however, by an Act, not an Appropriation Act, but subject to the limitations of the Constitution, change the provision made by law for the Courts. In case it should do so, the Comptroller must, the next time a Budget Bill is presented, certify the estimates for the judiciary, as provided by the law." (Italics supplied.) Paragraph Two of our Constitution is identical in language with the comparable section of the Maryland Constitution.
It is not necessary to refer to the Maryland Constitution to determine that the words "as provided by law" were never intended to have the meaning placed upon them by the Court's opinion. The second paragraph of Sub-section B of Section 51 of the West Virginia Constitution reads as follows: "Each budget shall be divided into two parts, and the first part shall be designated `Governmental Appropriations' and shall embrace an itemized estimate of the appropriations; (1) for the Legislature as certified to the board of public works in the manner hereinafter provided; (2) for the executive department; (3) for the judiciary department, as provided by law, certified to the Governor by the auditor; (4) to pay and discharge the principal and interest of any debt of the State of West Virginia hereafter created in conformity with the Constitution, and all laws enacted in pursuance thereof; (5) for the salaries payable by the State under the Constitution and laws of the State; (6) for the aid of public schools in conformity with the laws of the State; (7) for such other purposes as are set forth in the Constitution and laws made in pursuance thereof." (Italics supplied.) It is obvious, I believe, that the framers of the Budget Amendment to the Constitution, in using the phrase "as provided by law", were not referring to a specific Act of the Legislature, appropriating a specific sum of money for the public schools for the previous biennium, but were referring rather to the permanent laws of the State with regard to the public schools. There are many, beginning with the constitutional mandate of Section 1, Article XII: "The Legislature shall provide, by general, law for a thorough and efficient system of free schools." The legislative enactments are numerous, but I mention only a few: (1) The minimum teacher's salary; (2) free text books for *149 children; (3) teacher's retirement system; (4) vocational education; and (5) the constitutional and statutory provisions earmarking the capitation tax, cigarette tax, chain store tax and many other sources of revenue for the General School Fund.
In the interpretation of the Constitution, words must be construed with reference to their plain and ordinary meaning. May v. Topping, 65 W.Va. 656, 64 S.E. 848. In construing the words used by the drafters of the Budget Amendment, we must look to their contemporaneous construction which consists simply in the understanding of those words by those who drafted the Amendment, members of the Legislature who submitted it to a vote, and by the people who approved it at the ballot box. Certainly, it was not then intended that the phrase "as provided by law" meant the amount of money appropriated "in the Budget Act" of the previous biennium for public schools, inasmuch as there was no Budget Act, of course, prior to the adoption of the Budget Amendment. It would be interesting to know how the section would have been interpreted by this Court had the question been presented to it subsequent to the adjournment of the first Legislature, after the effective date of the Budget Amendment. Black's Law Dictionary, 3rd Edition, defines the word law as follows: "`Law', without an article, properly implies a science or system of principles or rules of human conduct, answering to the Latin `jus'; as when it is spoken of as a subject of study or practice. In this sense, it includes the decisions of courts of justice, as well as acts of the legislature. * * *" The phrases "as provided by law" and "provided by law" have been interpreted by many courts, including this one. In Lawson v. County Court of Kanawha County, 80 W.Va. 612, 618, 92 S.E. 786, 789, this Court held that: "* * * The phrases, `prescribed by law' and `provided by law', when used in constitutions, generally mean prescribed or provided by statutes. * * *" 34 Words and Phrases, Page 680; 4 Words and Phrases, Page 319.
The interpretation placed upon Paragraph Two could have a disastrous effect in the future upon the fiscal affairs of this State. The Court said that the Board of Public Works must recommend to the Legislature all estimates submitted to it for the public schools, without reduction, if such estimates are equal to or less than the amount appropriated for such purpose by the Legislature for the previous biennium. In other words, this means that the Board of Public Works is dependent upon the Legislature's previous appropriation for the minimum which it must recommend, unless the school authorities themselves, in preparing their estimates, voluntarily request a lesser amount. The sources of the general revenue of this State are very sensitive to the economic status of the State. For example, during the year 1952, the sum of $78,651,577, or approximately eightynine per cent of all general revenue receipts was derived from gross and consumer's sales taxes, and the tax upon liquor, beer and cigarettes. A prolonged labor dispute in one or more vital industries can, and has, drastically affected these sources of income. If an economic depression, similar to the one which occurred slightly more than twenty years ago, should suddenly recur, and the general revenue dropped, as it well might by fifty per cent or more, the Board of Public Works would find itself in the dilemma of being required to approve all requests for money for the public schools, as long as they did not exceed the amount appropriated therefor by the previous Legislature, even though there was not available sufficient additional funds to operate the other branches and departments of government. The Board might well be placed in the position of being forced to recommend for approval sums of money for the public schools which the financial condition of the State would not warrant, and then beseech the Legislature to reduce those amounts. However, the members of the Legislature, being sensitive to the political climate of their home communities, might well hesitate to make substantial reductions in appropriations for the public schools. Furthermore, the very purpose of the adoption of the Budget Amendment was to restrict the Legislature in the handling of the fiscal affairs of the State *150 and to eliminate financial deficits. The Legislature cannot, as has been very ably pointed out in the Court's opinion, prepare a budget, and in a financial or economic crisis, neither could the Board of Public Works under this interpretation. The Board of Public Works, consisting of the Governor, Secretary of State, Auditor, Superintendent of Free Schools, Treasurer, Attorney General and Commissioner of Agriculture, the elective heads of the seven major departments of the executive branch of the State government, having authority under the Budget Amendment to prepare and present a budget document to the Legislature, and, from the very nature of their official duties, being more familiar with the financial needs and expected revenues of the State for the ensuing biennum, is not, and should not be, bound by an amount appropriated by the previous Legislature at a time when the prevailing economic conditions may have been entirely different. I do not believe that the people of this State would have approved the Budget Amendment if they had known that the words "as provided by law" had such meaning as has been placed upon them by the Court's opinion.
The Court's opinion goes even further. It not only requires the Board of Public Works to approve the total amount requested for public schools, as long as it is equal to or less than the amount approved for that purpose by the previous Legislature, but it requires the Board to approve each item requested, in the sum approved by the previous Legislature for that particular item. The opinion specifically states that the Board of Public Works violated the provisions of Paragraph Two because the amount requested for free text books for the second year of the 1953-55 biennum had been reduced to an amount less than that which had been appropriated by the Legislature for the second year of the 1951-53 biennum. This despite the fact that the total appropriation for free text books for the 1953-55 biennum exceeded the total appropriation for the 1951-53 biennum by $50,000. In other words, the Court's opinion not only requires the Board of Public Works to recommend appropriations for the public schools, if required by those who have the authority to do so, in a total amount as great as that appropriated for the same purpose by the previous Legislature, but it goes much further, and requires the Board of Public Works to approve each item for which appropriation was made by the previous Legislature, and requires that the amount which is recommended for each item requested, for each year of the biennum, shall be at least equal to that theretofore approved by the Legislature.
The Court's opinion eliminates all appropriations as being those provided for the public schools, except appropriations for the "Department of Education, State Aid to Schools, and Text Books for Schools." I do not know by what reasoning it includes these three items and eliminates appropriations for the hot lunch program, vocational education and the State Board of School Finance. The principal function of the State Board of School Finance is to distribute to the counties their proportionate share of State aid, for maintenance of the public school system, in accordance with the formula adopted by the Legislature, and to supervise the budget problems of the County Boards of Education. Appropriations for the hot lunch program and vocational education, like those for free text books, are generally for the use and benefit of the public schools.
As heretofore stated, an interpretation of Paragraph Two of the Constitution was not necessary in deciding the issue involved in this case, and it is my earnest hope that those who are affected by that part of the opinion, which undertakes to interpret that paragraph, will understand that it is dicta and treat it as such.
I am authorized to say that Judge LOVINS joins with me in this concurring opinion.