STATE *ex rel.* WILLIAM T. BROTHERTON, JR., *etc., et al.*

*v.*

C. A. BLANKENSHIP, CLERK, *etc.*

(No. 13514)

Decided January 30, 1975.

*Jack M. McCarty, Robert M. Harvey* for petitioners.

*Chauncey H. Browning*, Attorney General, *Henry C. Bias, Jr.*, Deputy Attorney General, for respondent.

*Spilman, Thomas, Battle & Klostermeyer, W. Victor Ross* for intervenor *Arch A. Moore, Jr., Governor of W. Va.*

HADEN, CHIEF JUSTICE:

On September 4, 1974, the relators, the Honorable William T. Brotherton, Jr., as a member and President of the Senate of West Virginia, and the Honorable Lewis N. McManus, as a member and Speaker of the House of Delegates of West Virginia, and both as citizens and taxpayers of the State, sought to invoke the original jurisdiction of this Court through the issuance of a writ to require the respondent, C. A. Blankenship, Clerk of the House of Delegates and, as such, the keeper of the rolls and the custodian of the Acts and Joint Resolutions of the Legislature, "to publish the true Budget Act in such manner as to include the full and lawful purposes and as appropriated by the Legislature without the void deletions, reductions and vetoes attempted by the Governor and without giving effect to the unlawful and unconstitutional additions of figures and language and amendments and changes in the Budget Bill attempted by the Governor and to furnish Petitioners true copies of the Budget Act as so published...."

Thereafter, on September 9, 1974, this Court acting upon the allegations of the petition, issued a rule returnable September 24, 1974. The Honorable Arch A. Moore, Jr., Governor of the State of West Virginia then, on September 16, 1974, filed a motion praying that he be granted leave to intervene in this proceeding as a party respondent. That motion was granted by this Court. On September 25, 1974, upon the petition and exhibits, the demurrer of the respondent, the intervenor's demurrer and separate answer with exhibits filed in opposition to the petition, the joint stipulation of the parties, the

briefs and oral arguments of the respective parties, and the brief *amicus curiae* of Honorable George H. Seibert, Jr. as a member and Minority Leader of the House of Delegates of West Virginia, and as a citizen and taxpayer of the State, and upon the reply brief of the relators, this case was submitted for decision.

On November 6, 1974, this Court, by order, granted the relief prayed for in certain instances, denied such relief in other instances, and molded the writ in others to give appropriate relief required by the questions presented. On December 5, 1974, the relators and the respondent, C. A. Blankenship, Clerk, deeming themselves aggrieved by the rulings contained in the previous order of this Court, filed separate petitions for rehearing, assigned purported errors on the face of said order, and requested that the matters contained in the former order be set down for a full rehearing, that this Court correct its former order, and grant the relief as originally prayed for in the petition of the petitioners. This Court denied the two separate petitions for rehearing on December 13, 1974.

This opinion is now filed for the purpose of stating the reasons for, clarifying, and elaborating upon the holdings in the order of November 6, 1974.

As was true in two former cases decided by this Court, *State ex rel. Browning v. Blankenship*, 154 W. Va. 253, 175 S.E.2d 172 (1970) and *State ex rel. Brotherton v. Blankenship*, ___ W. Va. ___, 207 S.E.2d 421 (1973), resolving matters of dispute between the legislative and executive branches of government arising from the interplay of those branches pursuant to the Modern Budget Amendment, West Virginia Constitution, Article VI, Section 51, the primary issue presented is whether the several actions of the Governor in the exercise of his veto powers in relation to the Budget Act for fiscal year 1974-1975 are valid.

The Legislature, on July 3, 1974, enacted Enrolled Committee Substitute for Senate Bill No. 9, referred to

herein as the Budget Bill, providing for the budget of the State of West Virginia for the fiscal year 1974-1975. The Budget Bill was then presented to the Governor for his consideration in accordance with the provisions of the West Virginia Constitution, Article VI, Section 51, Subsection D(11). On July 15, 1974, the Governor signed the Budget Bill as approved with reductions and deletions and returned it with Executive Message No. 6 to the Legislature for further consideration by that body upon its return from recess. Both houses of the Legislature then gave consideration to the veto actions of the Governor in regard to the Budget Bill, but in so doing failed to muster the two-thirds vote required of both houses of the Legislature to override the veto actions of the Governor. The relators, not being satisfied with particular Budget Bill modifications made by the Governor through his veto actions, and believing those vetoes to be unlawful and unconstitutional, instituted this action praying for a writ of mandamus to compel the Clerk to publish the Budget Act unaffected by such veto actions.

Although the authority of the relators to maintain this proceeding in the official capacities as President of the Senate and Speaker of the House of Delegates, respectively, does not appear, they nevertheless demonstrate proper standing as citizens and taxpayers to maintain this proceeding to test the validity of the veto actions affecting the public revenue. See, *Delardas v. County Court of Monongalia County,* ___ W. Va. ___, 186 S.E.2d 847 (1972).

Due to the manner in which the Governor altered the Budget Bill after its passage by the Legislature, and due to the challenges made by the relators, the following basic issues are presented for resolution in this proceeding:

I. Does the Governor have the constitutional authority under the Modern Budget Amendment at the veto stage to veto any part of the accounts of the Legislature

of West Virginia appropriated for the operation of that branch of government as contained in the Budget Bill?

II. Does the Governor have the constitutional authority under the Modern Budget Amendment at the veto stage to delete from the Budget Bill language of purpose, finding, direction and condition, and nevertheless retain for expenditure purposes the moneys appropriated in certain accounts of the Budget Bill?

III. Does the Governor have the constitutional power under the Modern Budget Amendment at the veto stage to delete language of purpose and itemization and amounts relating thereto, contained in an account in the Budget Bill and thereafter reinsert lump sums and language of purpose or subject relating thereto in such account?

IV. Does the Governor have the constitutional authority under the Modern Budget Amendment to reduce the amount of money in accounts of the Budget Bill and thereafter modify such account by the insertion of new language, items or parts of items and new amounts therein?

The issues thus stated are in a form substantially as presented by the relators, and in this opinion we shall endeavor to treat and resolve those issues with a statement of facts giving rise to each issue and the law applicable thereto *seriatim.*

I

Accounts Nos. 101, 102, and 103 in the Budget Bill are the account appropriations providing for the operation of the West Virginia Legislature, as a separate branch of government, for fiscal year 1974-1975. Incident to the preparation of the Budget Document and the Budget Bill, these accounts, like those companion accounts for the judicial branch of government, are prepared and submitted to the Governor for inclusion in the Budget Bill in a special and particular way.

In order to preserve the integrity and independence of the separate branches of government in the context of the budget-making process, the people by ratification provided in Subsection D(9) of the Modern Budget Amendment a plan to insure that each branch of government would exercise its rightful prerogatives and no more, even though the Governor was authorized and charged with the responsibility of the overall preparation and submission of the Budget Bill and Budget Document. That section provides:

> "For the purpose of making up the budget, the governor shall have the power, and it shall be his duty, to require from the proper state officials, including herein all executive departments, all executive and administrative officers, bureaus, boards, commissions and agencies expending or supervising the expenditure of, and all institutions applying for state moneys and appropriations, such itemized estimates and other information, in such form and at such times as he shall direct. *The estimates for the legislative department, certified by the presiding officer of each house, and for the judiciary, as provided by law, certified by the auditor, shall be transmitted to the governor in such form and at such times as he shall direct, and shall be included in the budget.*" (Emphasis supplied.)

Pursuant to the above, the Legislature, through its appropriate officers, prepared its estimated expenditures for the 1974-1975 fiscal year and transmitted them to the Governor for inclusion in the Budget Document and Budget Bill. In turn, the Governor, pursuant to the directions of Subsections D(10) and B(3) of the Modern Budget Amendment, included the estimated expenditures for the legislative department of government in the Budget Bill. That latter section provides, *inter alia:*

> "Each budget shall embrace an itemized estimate of the appropriations, in such form and detail as the governor shall determine or as may be

prescribed by law: (a) For the legislature as certified to the governor in the manner hereinafter provided; . . . ."

And, with the other proposed appropriations for the executive department and the judicial department of government, the Governor transmitted the budget as directed by the following language of Subsection B(4) of the Modern Budget Amendment:

"The governor shall deliver to the presiding officer of each house the budget and a bill for all the proposed appropriations of the budget clearly itemized and classified, in such form and detail as the governor shall determine or as may be prescribed by law; and the presiding officer of each house shall promptly cause the bill to be introduced therein, and such bill shall be known as the 'Budget Bill.' "

After the Budget Bill had been prepared, transmitted and introduced as a proposed appropriation measure in accordance with these constitutional directives, the Legislature purported to amend its Accounts Nos. 101, 102, and 103 by expanding and adding, in several respects, new language to the Budget Bill as introduced. Two of those modifications are the subject of the first issue; and the Governor's corresponding action with regard thereto is the predicate of this issue.

In Account No. 101, the appropriation account for the operation of the Senate, in Account No. 102, the appropriation account for the operation of the House of Delegates, and in Account No. 103, the appropriation account for the funding of the joint expenses of the Senate and the House operating annually as a unified branch of government, the inserted additional language would have, upon certain corresponding conditions, required that "the state auditor shall transfer amounts between items of the total appropriation in order to protect or increase the efficiency of service." The effect of the quoted language was to authorize the appropriate ad-

ministrative officers of the Legislature to accomplish "line item transfers" of appropriations for expenditure purposes during the fiscal year without further amendment of the Budget Bill and without regard to designated appropriation classifications provided for within the Budget Bill such as personal services, current expenses, equipment, etc.

Beyond that, the Legislature further amended Account No. 103 by adding the following language of appropriation:

> "In addition to those funds normally allocated to the Legislative Auditor's office from Line 3 above, there is hereby appropriated an additional amount of $250,000 for the purpose of making a continuous examination and analysis of the state budget, revenue and expenditures, and departmental programs during and between sessions of the Legislature."

"Line 3 above," within the quotation, refers to a line item appropriation as follows: "Joint Committee on Government and Finance—$1,585,513."

Upon passage of the Budget Bill containing this and other new language, the Governor, through the exercise of a partial veto, excised the language permitting line item transfers in Accounts Nos. 101, 102, and 103, and, as well, deleted or struck the language seemingly appropriating an additional $250,000 to fund a continuous budgetary analysis by the office of Legislative Auditor. As required by Subsection D(11), when exercising veto authority, the Governor accompanied his partial veto of these accounts with a statement of objections or reasons and transmitted the same to the Legislature with the Budget Bill as modified by his veto actions. See *State ex rel. Browning v. Blankenship, supra.*

The chief executive derives such authority as that office has to veto a Budget Bill, as passed by the Legislature, from the provisions of Subsection D(11) of the Mod-

ern Budget Amendment which state, *inter alia:* "The governor may veto the bill, or he may disapprove or reduce items or parts of items contained therein." This veto authority, although broadly and expansively granted, is not without limits, however. Relevant to the issue under discussion, this Court held in *State ex rel. Brotherton v. Blankenship,* ___ W. Va. ___, 207 S.E.2d 421 (1973) that:

> "The Governor does not possess the authority under the provisions of Article 6, Section 51 of the West Virginia Constitution to disapprove or reduce items or parts of items contained in the Budget Bill, as enacted by the Legislature, which relate to the judiciary department." *Syllabus* point 5., *id.*

Relying upon that holding in the previous *Brotherton* case, the relators logically contend that the Governor also does not possess authority under the provisions of Article VI, Section 51 of the West Virginia Constitution to disapprove or reduce items or parts of items contained in the Budget Bill, as enacted by the Legislature, which relate to the legislative department.

In the 1973 *Brotherton* case, the judicial department prepared its budget proposal and submitted it to the Governor for introduction as integral parts of the Budget Document and the Budget Bill. There, however, the Governor reduced the estimates of expenditures certified to his office by the judiciary before transmitting the same to the Legislature for the purpose of introduction as a part of the Budget Bill. His action in so doing was improper and the Legislature of its own motion restored the estimates submitted by the judiciary. See W. Va. *Const.* art. VI, § 51, D(10). The Governor's later veto, which in the same manner again reduced the judiciary estimates of its financial need, was then struck down by this Court. On the other hand, in the present case, the Legislature purported to amend its budget by adding additional language thereto after introduction of the

Budget Bill in the original form in which the Legislature itself had prepared and certified its estimates to the Governor. As will appear, this is a difference in facts calling for distinction.

The system of "checks and balances" provided for in American state and federal constitutions and secured to each branch of government by "Separation of Powers" clauses theoretically and practically compels courts, when called upon, to thwart any unlawful actions of one branch of government which impair the constitutional responsibilities and functions of a coequal branch. This rationale persuaded this Court that it was constitutionally necessary to delimit the Governor's expansive arrogation of veto power colorably exercised by him in relation to the judiciary's own budget. Unquestionably, this principle would also cause this Court to invalidate an attempt by the Governor to veto the Legislature's estimated budgetary requirements for its internal operations as prepared and submitted by that body for inclusion in the Budget Bill. In either instance, Article V, Section 1, and the several provisions of Article VI, Section 51 of the Constitution, relating to the preparation and submission of the Budget Document and Budget Bill, compel the Governor to preserve, introduce and leave intact the submitted budgetary proposals of other coequal units of government.

Consequently, we reject the intervenor's contentions that the Separation of Powers doctrine only acts to restrict the Governor's budgetary veto power as it applies to the judicial branch of government, and that the Legislature is well-armed to otherwise protect its own budget proposals. This latter contention is irrelevant in a constitutional context.

The intervenor, however, supports the legality of his veto actions on Accounts Nos. 101, 102, and 103 on several other bases, assumptively not controlled by the application of the Separation of Powers doctrine. For example, the Governor contends that he had a sound legal

basis to support his veto of the legislative accounts because he was merely striking invalid amendatory actions by the Legislature which would have resulted in the inclusion of matters within a budget bill not germane to the budgetary process and not specifically set forth in the title of the budget bill. As such, the Governor contends that these additions to the Budget Bill were invalid and unconstitutional under Article VI, Section 30 of the Constitution. This position is untenable in that this Court has previously held that appropriation measures are not limited by this section of the Constitution. The decision of *State ex rel. Key v. Bond*, 94 W. Va. 255, 118 S.E. 276 (1923) implicitly recognizes that as the budget provides an expenditure plan for the entire operations of government within a fiscal period, all appropriation matters contained therein are germane to the budgetary process, and holds that language or objects germane to the Budget Bill and purpose need not be set forth with particularity in the title of the Budget Bill.

The Governor also assails the amendments to the legislative accounts as being unconstitutional special or "class" legislation otherwise provided for in general law in Chapter 5A of the *Code*. This statute merely prohibits line item transfers without additional legislative action within budgets of agencies in the executive department of government. *See, Board of Education v. Board of Public Works*, 144 W. Va. 593, 109 S.E.2d 552 (1959). We also note that *Code* 1931, 5A-2-33, as amended, generally excepts the legislative and judicial branches of government from the regulatory provisions of Chapter 5A of the *Code*. That statute is consistent with the intent and language of Article VI, Section 51, the Modern Budget Amendment, that the budget officer for the executive department should assume no right to control or impede the general plan of expenditures for the necessary internal operation of the legislative and judicial departments of government during a spending year.

Parenthetically, in regard to the Legislature's authority to effect "line item transfers" within a spending

year, we are unaware of any constitutional or statutory inhibition which would prevent the Legislature from transferring its line item appropriations on its own motion. Such authority is pure legislative prerogative, whether formally exercised by legislation or authorized by rule adoption of the joint or individual legislative bodies.

Although the foregoing contentions are without merit, the intervenor, nevertheless, successfully asserts a further reason for his partial veto of the legislative accounts. To resolve the issue it is necessary to discuss somewhat extensively the provisions of Article VI, Section 51 of the Constitution.

The Legislature derives its authority to enact an appropriation measure solely through the grant of power given in the Modern Budget Amendment. That the power to appropriate has limitations is apparent from the language of the Amendment. The opening sentence of the Amendment provides: "The legislature shall not appropriate any money out of the treasury except in accordance with provisions of this section." This language, identical to that found in the predecessor provision to the Modern Budget Amendment, has been construed by this Court in *State ex rel. Trent v. Sims*, 138 W. Va. 244, 77 S.E.2d 122 (1953). In *Syllabus* point 9. of that decision, this Court held that this provision meant precisely what it said:

> "The words 'shall not', as used in the first paragraph of Section 51, Article VI, West Virginia Constitution, should be given their general and ordinary meaning, and read as prohibiting the Legislature from appropriating any money out of the treasury, except in accordance with the provisions of Section 51." *Id.*

As respects the Budget Bill, Subsection B(5) of the Amendment permits the Legislature to amend the Bill as prepared and introduced by the Governor. But, that authority is restricted: "The Legislature shall not

amend the budget bill so as to create a deficit but may amend the bill by increasing or decreasing any item therein: . . . ." W. Va. *Const.* art. VI, § 51,B(5). In the first *Brotherton* case, Justice Caplan, speaking for a majority of the Court, construed this provision thusly:

> "Article 6, Section 51(5) of our Constitution permits the Legislature to 'amend the bill by increasing or decreasing any item therein', so if it had increased or decreased the *amount* of an item such as 'Other Personal Services' its action would be in line with that allowed. However, when the Legislature undertook to expand on the Governor's budget by specifying positions under the item 'Other Personal Services' and designated salaries therefor, it began to usurp the executive power reserved by the Constitution for that branch of government. The Constitution clearly contemplates an executive budget . . . ."

> . . . .

> ". . . [T]he Legislature can then exercise its judgment as to whether the executive *figures* should be increased, decreased or approved as submitted. Thus the Legislature is afforded the prerogative contemplated by the Constitution." (Emphasis supplied.), *Supra,* at 434-35 of 207 Southeastern Second.

In our view, this Court, in order to preserve for the executive department its authority to prepare and submit a budget and thereby insure initial consideration of its fiscal proposals and priorities, relatively intact or without substantial modification by the Legislature, thereby clearly held that the Legislature's authority to increase or decrease items was limited to increase or decrease of the monetary amounts originally submitted by the Governor.

On the other hand, the Legislature is not prohibited from originating an appropriation measure creating an item or part of an item. It is clearly authorized to frame

and enact its own fiscal priorities, pursuant to Subsection C(7) of the Amendment, through the vehicle of supplementary appropriation bills. That provision states:

> "Neither house shall consider other appropriations until the budget bill has been finally acted upon by both houses, and no such other appropriations shall be valid except in accordance with the provisions following: (a) Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose therein stated and called therein a supplementary appropriation bill; (b) each supplementary appropriation bill shall provide the revenue necessary to pay the appropriation thereby made by a tax, direct or indirect, to be laid and collected as shall be directed in the bill unless it appears from such budget that there is sufficient revenue available."

Nevertheless, in preservation of the concept of an executive budget, and applying Subsections C(7), B(5) and other parts of the Amendment together, we hold that, excepting amendments to increase or decrease an amount of an item, the Legislature is otherwise required to first consider and take some form of action upon the Budget Bill before commencing the exercise of its own appropriation prerogatives. This position is not novel. Construing the predecessor provision to Subsection C(7), this Court held:

> "The words 'Neither House shall consider other appropriations until the budget bill has been finally acted upon by both Houses,' contained in Sub-Section C, Section 51, Article VI, West Virginia Constitution, mean that the Houses of the Legislature shall not consider other appropriations until the budget bill has been finally acted upon by both Houses, and this clause prohibits the Legislature from considering other appropriations until a constitutional budget bill has been finally acted opon." *Syllabus* point 10., *State ex rel. Trent v. Sims, supra.*

While we freely acknowledge the potential for the creation of a "legislative" budget, as opposed to an "executive" budget, through the enactment of a series of supplementary appropriation bills, the fact remains that part of the questioned amendments to Accounts Nos. 101, 102, and 103, adding language of subject, purpose or condition, were unathorized additions to the Budget Bill.

Accordingly, we hold that the Governor has the power, pursuant to the plain provisions of Subsection D(11), *supra*, to disapprove and strike unauthorized insertions added to the Budget Bill after its preparation and introduction as an appropriation proposal. *Cf., State ex rel. Brotherton v. Blankenship, supra*, at 435 of the Southeastern Reporter, *i.e.*, discussion therein contained on the Legislature's colorable attempt to amend by insertion, which was also disapproved.

As noted, the Legislature purported to amend Account No. 103 by appropriating an "additional amount of $250,000 for the purpose of making a continuous examination and analysis of the state budget, etc. . . . ." The Legislature has the authority to increase amounts of items so long as no deficit is created and thus the additional appropriation stands, although the language of subject or purpose falls by veto. W. Va. *Const.* art. V, § 1, art. VI, § 51, B(5). In the petition for rehearing, relators quarrelled with the correctness of the Court's order modifying Legislative Account No. 103 as it recognized the Legislature's right to increase its appropriation, alleging that our order added $250,000 to the total budget and cast it into a deficit posture. Such was not our intention; the intention was merely to save unto the Legislature the apparent additional amount it had appropriated to the "Joint Committee". The account, therefore, stands in the amount appropriated; as appropriated, no deficit results. *See*, Account No. 641, *infra*.

As previously noted with reference to "line item transfer" authority, we likewise believe the Governor's veto

of language "purposing" the $250,000 additional appropriation to have been unavailing if it was done to prevent exercise of inherent legislative prerogative.

## II

The issue concerning the Governor's constitutional authority under the Modern Budget Amendment to delete at the veto stage language of purpose, finding, direction and condition and nevertheless retain for expenditure purposes the moneys appropriated in certain accounts of the Budget Bill is highly reminiscent of last year's budget case. So reminiscent, in fact, we pause to wonder why it was posited a second time. *State ex rel. Brotherton v. Blankenship, supra.* In that case, the relators, occupying the same position of alignment in the case as they do now, conceded that the explicit language of Subsection D(11) of the Amendment provided that the Governor could disapprove or reduce an item or part of an item. The bone of contention then was the definition of the word "item". In disposing of that issue, the Court quickly approached and handled the problem thusly:

> "Let us now consider the acknowledged prerogative of the Governor to 'disapprove or reduce items or parts of items' contained in the Budget Act and determine whether the Governor exceeded his powers as contended by the relator. The term 'item' wherein it relates to the budget embraces a subject or purpose and an amount. *Green v. Rawls,* (Fla. 1960) 122 So.2d 10; *State ex rel. Brown v. Ferguson,* 32 Ohio St.2d 245, 291 N.E.2d 434 (1972); *State ex rel. Turner v. Iowa State Highway Commission,* (Iowa 1971) 186 N.W.2d 141; *People v. Tremaine,* 281 N.Y. 1, 21 N.E.2d 891 (1939); and *Reardon v. Riley,* 10 Cal.2d 531, 76 P.2d 101 (1938)." (Emphasis supplied.) *Id.* at 435.

With the foregoing simple and direct statement, this Court thought to settle once and forever any question concerning the Governor's right either to veto an item

or part of an item, or to reduce an item or part of an item.

Both the majority and Justice Neely, in dissent, realized that this holding went to the heart of that, and perhaps any future, budget case arising in the context of the present constitutional provision. The majority believed in the normal course of events that the most common and oft-occurring type of veto exercised by the Governor on a budget bill or supplemental appropriation measure presented him by the Legislature would involve either the reduction of an item or part of an item or the complete veto of an item, or the veto of part of an item. Because the conclusions warrant, and for the additional reason that the judiciary wishes to avoid acting as an annual referee to that which should be resolved most often by an active interplay between the Legislature and the chief executive of the State, this Court adopted a simple, but comprehensive definition of the word "item" as it is employed in the grant of veto power to the Governor found in Subsection D(11) of the Amendment. Justice Neely, concerned with the active role given the Governor by the people through ratification of the Amendment, as so interpreted by the majority of this Court, and being apprehensive at the somewhat diminished power of the Legislature in respect to the enactment of the Budget Bill, expressed himself in a very well prepared dissent. That dissent ably exposited the views of the relators in last year's case and this year's case, and served, by its preciseness, to sharpen the thrust and import of the majority's decision to acknowledge the power of the Governor to protect his fiscal priorities through the exercise of a strong veto power. Justice Neely relied upon two decisions considered by the majority of this Court, which were strongly supportive of the power of the Legislature in respect to the enactment of budget and appropriation measures, and which greatly minimized the role of the Governor or the chief executive in the budgetary process. Those decisions were: *In Re Opinion of The Justices*, 294 Mass. 616,

2 N.E.2d 789 (1936), and *Commonwealth v. Dodson*, 176 Va. 281, 11 S.E.2d 120 (1940). Those cases, and one other cited there and again here, *State ex rel. Cason v. Bond*, 495 S.W.2d 385 (Mo. 1973), stand for the view that items or parts of items refers to separable fiscal units and that "the veto power does not carry with it the power to strike out conditions or restrictions." The majority of this Court then, and now, reject that definition of the word "item," and that limitation of the Governor's veto power under the Modern Budget Amendment as authorized by the people of West Virginia.

In confirmation of last year's decision, the majority reaffirms the definition of item as therein adopted. Additionally we hold that an item may occur as a separate particular in an enumeration, account, or total, and may be any separate subject and amount within an account or total. The express inclusion of the words "parts of items" in our Modern Budget Amendment's enhancement of veto powers renders such conclusion even more compelling. The questions re-put in this litigation apparently also require this specificity.

In the 1973 *Brotherton* decision, *supra*, this Court held that the veto power granted by the people to the Governor in the Modern Budget Amendment in Subsection D(11) although broadly and expansively stated, was, nevertheless, limited by other relevant provisions of the West Virginia Constitution which were to be read in conjunction with the Modern Budget Amendment. We extensively discussed aspects of that limitation in regards to "Separation of Powers" concepts exposited in Part I. Further elaboration is unnecessary. The first *Brotherton* decision also recognized a further limitation on the Governor's veto power by holding that the Governor may not reduce the funds allocated in the Budget Bill to a constitutional officer within the executive department to zero, thereby effectively eliminating the function of that office. Moreover, the Governor may not, by the exercise of his veto prerogative, perform any act

which would result in the elimination of free schools in the State of West Virginia, since a free system of public schools is constitutionally mandated and unambiguously protected by Article XII, Section 1 of the West Virginia Constitution.

Except for the foregoing limitations, this Court and, as noted, the parties, forthrightly acknowledged the Governor's right to disapprove or reduce items or parts of items otherwise contained in the Budget Bill. In the case presented for decision now, there are several accounts appertaining solely to the executive department of government upon which the Governor exercised the veto power given him in Subsection D(11) of the Modern Budget Amendment. As to those accounts, the exercise of the Governor's veto power has not been qualified or restricted by the limitations previously noted.

For purposes of illustration we hereinafter set forth facsimile reproductions of the questioned accounts as enacted by the Legislature and, where stricken or modified by the Governor, the veto actions of the Governor in the manner exercised by him.

Account No. 350 emerged from the veto stage in the following form:

46—*West Virginia Library Commission*
Acct. No. 350

| | | |
|---|---|---:|
| Personal Services | $ | 449,000 |
| Current Expenses | | 150,000 |
| Repairs and Alterations | | 3,500 |
| Equipment | | 5,000 |
| Books and Periodicals | | 60,000 |
| Grants-in-Aid | | 800,000 |
| Library Matching Fund | | 1,500,000 |
| ~~Putnam County Library~~ | | ~~50,000~~ |
| ~~Boone County Library~~ | | ~~75,000~~ |
| ~~New Martinsville Library~~ | | ~~220,000~~ |
| ~~Roane County Library~~ | | ~~300,000~~ |
| ~~Richwood Library~~ | | ~~135,000~~ |
| ~~6 Instant Libraries~~ | | ~~210,000~~ |
| ~~The balance of the above appropriation to be~~ | | |
| ~~used at the discretion of the Library Com-~~ | | |
| ~~mission.~~ | | |
| Total | $ | 2,967,500 |

As illustrated, the Governor lined through and struck items containing both subject and amount which would have made specific appropriations to Putnam County Library in the amount of $50,000 and similar appropriations to other specified beneficiary libraries. These appropriations were to be obtained from the total Library Matching Fund item in the amount of $1,500,000. By striking the specified amounts dedicated to the particular projects, the Governor thereby, in effect, retained the right to expend the amount of $1,500,000 for the more general subject of Library Matching Fund rather than giving over to the more specific legislative priorities. This veto action is clearly authorized by Subsection D(11) of the Modern Budget Amendment and on that basis we approve it.

Account No. 485, after the veto action, appears as follows:

95—*West Virginia State Aeronautics Commission*
Acct. No. 485

| | | |
|---|---|---|
| Personal Services | $ | 32,220 |
| Current Expenses | | 20,655 |
| Equipment | | 2,000 |
| Aerial Markers | | 1,200 |
| Civil Air Patrol Expenses | | 18,500 |
| Airport Matching | | 1,500,000 |
| ~~Logan~~ | ~~514,000~~ | |
| ~~Beckley~~ | ~~362,034~~ | |
| ~~Keyser~~ | ~~180,000~~ | |
| ~~The balance of the above appropriation to be~~ | | |
| ~~used at the discretion of the West Virginia~~ | | |
| ~~State Aeronautics Commission.~~ | | |
| Total | $ | 1,574,575 |

Any unexpended balance remaining in the appropriation "Airport Matching Fund" at the close of the fiscal year 1973-74 is hereby reappropriated for expenditure during fiscal year 1974-75.

Thus, in Account No. 485, the Governor vetoed the specific items of "Airport Matching" appropriations for "Logan", "Beckley" and "Keyser" in the amounts of $514,000, $362,034, and $180,000, respectively, and thereby retained the right to expend, unrestricted, except within the confines of lawful purposes, an appropriation of $1,500,000 for the subject of "Airport Matching" with-

in the State of West Virginia. This veto action, indistinguishable in principle from the veto action exercised as respects Account No. 350, is likewise authorized by Subsection D(11) of the Modern Budget Amendment and, on this basis, approved by this Court.

In Section 5 of Title II of the Budget Bill—Appropriations From Revenue Sharing Trust Fund, the following portion of the account with veto action appears:

Item IV—*Department of Natural Resources* . $ 3,395,200
21 Hawks Nest recreation and improvements .. 100,000
22 Canaan Valley — ~~Development of picnic areas,~~
23 ~~campgrounds, tennis courts, auxiliary water~~
24 ~~system to irrigate golf course, complete golf~~
25 ~~cart paths~~ ............................................. 715,000
26 Grave Creek Mound State Park — To complete
27 development ........................................ 750,000
28 Twin Falls State Park — ~~Completion of camp~~
29 ~~ground and picnic area, game courts, and~~
30 ~~paving of golf cart paths~~ ......................... 300,000

In the appropriations of Item IV, Canaan Valley, in the amount of $715,000, and Twin Falls State Park, in the amount of $300,000, language of purpose or condition, directing how the money appropriated for these facilities should be spent, was excised by the Governor. This veto action is also clearly authorized by Subsection D(11) of the Modern Budget Amendment as language of purpose or condition is a part of an item, within the definition adopted in the first *Brotherton* case.

Two other veto actions of the Governor are also controlled by the principle allowing the Governor to disapprove or reduce an item or a part of an item. Because of the method of veto in respect to Item No. 641, and because of the placement of the vetoed language in the Budget Bill as respects the item found in "Sec. 3. Classification of Appropriations, etc.", an explanation of these veto actions requires a somewhat more particular treatment than those previously approved.

In Account No. 641, created by the Legislature and added to the Budget Bill, the following appropriation and subsequent veto action appears:

125—*State Department of Highways*
Acct. No. 641

$4,500,000.00

~~If appropriate action is taken to grant to each~~ ~~employee of the Department of Highways so~~ ~~employed on July 1, 1974, and who has been~~ ~~so employed for one full year prior to such~~ ~~date, a 7½; ¬cent per annum increase in his~~ ~~compensation during the period of his em-~~ ~~ployment subsequent to such date and prior~~ ~~to July 1, 1975,~~ then the sum of $4,500,000, ~~is~~ ~~hereby appropriated for such purpose. Unless~~ ~~such appropriate action is taken and such per~~ ~~annum increase is received by each such em-~~ ~~ployee, then this Acct. No. 641 and the fore-~~ ~~going sum set forth in this Acct. No. 641 shall~~ ~~be void with like effect as if such Acct. No.~~ ~~641 and such sum had not been included in~~ ~~this act.~~

*[handwritten margin notes: Line 1 through part of line 8; line 8 from word "is" through line 16 page 414 deleted. A.M.J.]*

In this account the Governor purported to strike all language of condition and purpose which would have made the appropriation in the amount of $4,500,000 operable only if the Governor, through his highway commissioner, were to apply these funds to give each employee of the Department of Highways employed as of a certain date a seven and one-half percent per annum increase in compensation for fiscal year 1974-1975. If this veto action had been permitted to stand as partially disapproved by the Governor it would have read as follows: "125—*State Department of Highways*—Acct. No. 641 The sum of $4,500,000." Comparatively, Account No. 670, treated *infra* in this opinion under Part IV, also provides appropriations for the operations of the State Department of Highways in the amount of $386,100,000. Inasmuch as the Governor's actions make it impossible for this Court or for the Legislature to determine what subject classification or purpose classification is intended by this modified appropriation, when comparing it to the much larger appropriation for the State Department of Highways found in Account No. 670, a majority of this Court holds that while the Governor has the authority to delete language of purpose or condition from an item and thereby accomplish a disapproval of part of an item, he may not do so in a manner which will permit him to retain an appropriated amount without an ascertainable

classification of subject or purpose. As noted by Justice Caplan in the first *Brotherton* decision:

> "Reason dictates that the budget must be in sufficient form and detail to inform the Legislature whether the proposed expenditures are adequate for their purpose or in excess of that needed," *Supra*, at 435 of the Southeastern Reporter.

Likewise, reason would dictate that items altered by veto should retain sufficient identity of subject or purpose and amount to permit intelligent review by the Legislature when it reconsiders veto actions of the Governor. Accordingly, we hold that the attempted partial disapproval of the item fails as a veto of part of an item, but that, when the amount is sought to be retained, and subject or purpose does not appear, the veto must be construed as a disapproval of the whole item, as authorized under Subsection D(11) of the Modern Budget Amendment.

The holding in Part I, *supra*, of this opinion also applies to support and to validate this item veto. "The Governor has the power, pursuant to the plain provisions of Subsection D(11), *supra*, to disapprove and strike unauthorized insertions added to the Budget Bill after its preparation and introduction as an appropriation proposal." Part I, *supra*.

Parenthetically, we note that the foregoing ruling should not be construed by any party to this proceeding as passing upon the ability of the Legislature to condition the effectiveness of an appropriation for personal services expenditures in a manner determined by the Legislature rather than the Executive. That question was not presented for resolution and need not be resolved by this opinion. The foregoing holding goes no further than to rule upon the constitutional basis and validity of the Governor's veto action.

In Section 3 of Title I of the Budget Bill—General Provisions, appropriations are classified in seven gener-

416

al categories and defined or distinguished one from the other. That section defines "Personal Services", "Current Expenses", "Repairs and Alterations", "Equipment", "Buildings", "Lands", and "Appropriations Otherwise Classified". Although one normally would not regard said Section 3 as a "place" where specific appropriations are to be found, such was the occurrence in this case and resulted in a contested veto action by the Governor. The following illustrates the language of appropriation and the Governor's veto thereon:

**Sec. 3. Classification of Appropriations.**—An appropriation for:

"Personal Services" shall be expended only for the payment of salaries, wages, fees and other compensation for skill, work, or employment, and such classification of appropriations, for fiscal year one thousand nine hundred seventy-five, (wherever appearing in this act, has been funded to include a seven and one-half percent salary increase over fiscal year one thousand nine hundred seventy-four for each and every state employee payable therefrom and who may lawfully receive the same; which said salary increase shall be paid by any and all heads of spending units or other employer authorized to make such payment;) *Provided,* That from the appropriations made to the spending units of State Government, there may be transferred upon approval of the Governor, to a special account an amount sufficient to match Federal Funds under any Federal Acts.

*part of line 7 to and including line 13 deleted.*

*aam. J s.*

As with Account No. 641, which related to a seven and one-half percent salary increase for department of highway employees, the Legislature inserted language into the section providing for an appropriation sufficient to include a seven and one-half percent salary increase in fiscal year 1974-1975 for all other State employees. The Governor deleted this language of purpose and appropriation. The subissue in regard to this particular veto action is whether the Legislature has, by inserting appropriation language into a classification or definition section of the Budget, thereby protected it from a veto authorized by Subsection D(11) of the Modern Budget Amendment. Our previous holding, authorizing the Governor to strike unauthorized insertions into the Budget Bill by veto action, would in itself answer this question

in the negative. In addition, however, it seems clear that the stricken language may be excised from the Budget under the general authority of Subsection D(11) of the Amendment. While rather artfully disguised as general language within a definition in the classification section of the Budget, the effect of the language stricken by the Governor clearly places it within the ambit of an "item" within the meaning of the Budget Amendment.

As a logical corollary to this Court's alignment with and adoption of the definition of the term "item", as determined and applied in the case of *Green v. Rawls, supra,* we likewise adopt the reasoning expressed in the fourth headnote assigned to that case:

> "Whenever the legislature states in an appropriation bill that a specified sum of money raised by taxation shall be spent for a specified purpose, and that alone, while other sums mentioned in the bill are to be used likewise, the specified expenditure is an 'item' within a bill, and may be vetoed by the governor without affecting any other items of appropriation contained therein. F.S.A.Const. art. 4, § 18." *Id.,* at 10.

Even more nearly in point is the definition of the word "item" adopted in *Fairfield v. Foster,* 25 Ariz. 146, 157, 214 P. 319, 323 (1923), and quoted in *Green v. Rawls, supra:*

> "* * * [W]henever the legislature goes to the extent of saying in any bill appropriating money that a specified sum of money raised by taxation shall be spent for a specified purpose, and that alone, while other sums mentioned in the bill are to be used otherwise, no matter what language it may be disguised under, it is, nevertheless, within both the spirit and letter of the Constitution, an 'item' within the bill, and may be disapproved by the Governor without affecting any other items of appropriation contained therein."

To like effect and holding, see also the cases of *Wood v. Riley,* 192 Cal. 293, 219 P. 966 (1923) and *State ex rel.*

*Brown v. Ferguson,* 32 Ohio St.2d 245, 291 N.E.2d 434 (1972).

Without further elaboration, it is believed that the foregoing authorities clearly reveal the compelling logic requiring consideration of such a provision as an item or part of an item in the Budget Bill, as contemplated by Article VI, Section 51 of our State Constitution. Having thus perceived the excised language to be an item or part of an item in the Budget Bill, the Governor's veto action was authorized and approved.

## III

The issue concerning the Governor's veto authority to strike enumerated appropriation items or parts of items therein and in lieu thereof to reinsert sums equal to the sum of the parts of items and items stricken is directly and unequivocally controlled by the decision in the first *Brotherton* case, *supra.*

In Account No. 670, State Department of Highways, the Governor prepared and submitted his proposal as follows:

### "TO BE PAID FROM STATE ROAD FUND

1.  Unclassified—Total ................... 386,100,000"

Consistent with Section 3 of the General Provisions of the Budget Bill, permitting the submission of accounts "Otherwise Classified, etc.", the Governor did not specify in any detail whatsoever a further "breakout" of highway department budget requirements. He did, however, follow this request with an extensive statement of condition, purpose and authority as to the disposition of these funds. Apparently not being satisfied with the Governor's unclassified aggregate request of $386,100,000, the Legislature inserted extensive itemization within this account. The facsimile reproduction which follows demonstrates the Legislature's insertions by way of specification and also the Governor's veto action and reinsertion of the total amount requested in the prepared and submitted Budget Bill:

**127—State Department of Highways**
**Acct. No. 670**

TO BE PAID FROM STATE ROAD FUND

Federal Aid Programs ................................ $227,000,000.00 adm. f.

General Operations ................................ $159,100,000.00 adm. f.

Total ................................................. $386,100,000

Once again, we see the Governor's constitutional province of itemization [Subsection B(4)] improperly invaded by legislative insertions. For reasons stated in Part I, *supra*, the Governor's action was proper. Nevertheless, we also consider the propriety of the veto action independently of the question arising upon the origin of the language.

By his veto, the Governor struck all legislative itemization from Account No. 670 but retained two item subjects approved by the Legislature: "Federal Aid Programs" and "General Operations". To these respective subjects, the Governor reinserted the amounts of $227,000,000 and $159,100,000, which totalled $386,100,000, the original amount of the unclassified total request. This type of veto action was specifically approved in *State ex rel. Brotherton v. Blankenship, supra:*

> "Under Article 6, Section 51 of the West Virginia Constitution, the Governor does have the authority to strike items or parts of items pertaining to the budget of the executive department and in lieu thereof to *insert* a lump sum figure equal to the sum of the parts of items stricken after the Budget Bill has been enacted by the Legislature and presented to him for approval." (Emphasis supplied.) *Syllabus* point 8., *id.*

The Governor's veto actions on Account No. 670 are accordingly approved as constitutionally exercised.

We observe that this Court is naturally disposed toward giving the most careful attention and the highest respect to the policy positions of the relators as public officials who head another branch of government. We feel this burden particularly when called upon to resolve a constitutional dispute between the legislative and executive branches of government. Nevertheless, in regard to this particular attempt to re-litigate an issue recently settled by explicit ruling of this Court, it is difficult to be more precise and specific in fashioning an answer concerning the validity of a particular veto action without specifying the law to an extent that it thereby loses its precedential value under the doctrine of *stare decisis*.

## IV

Unlike the issues contained in Parts II and III of this opinion, the legal contentions raised in respect to the Governor's veto actions on Account No. 295 present new matters.

In the preparation of and submission of Account No. 295, the Governor prepared the account as follows:

*38—State Department of Education—State Aid to Schools*
Acct. No. 295

| | | |
|---|---|---|
| 1 | Professional Services · · | $146,859,162 |
| 2 | Salaries—Other Personnel | 28,701,425 |
| 3 | Fixed Charges * | 14,625,351 |
| 4 | Transportation Charges | 5,421,927 |
| 5 | Administration | 1,435,060 |
| 6 | Other Current Expense | 17,220,855 |
| 7 | Conversion Costs | 414,709 |
| 8 | National Average Attainment | 2,978,385 |
| 9 | Program Improvement | 1,630,068 |
| 10 | Increased Enrollment | 700,000 |
| 11 | Seven and one half (7½) Percent Salary In- | |
| 12 | crease for Professional Personnel | 11,014,437 |
| 13 | Seven and one half (7½) Percent Salary In- | |
| 14 | crease for Supporting Personnel | 3,410265 |
| 15 | Sub Total | $234,411,644 |
| 16 | Less Local Share | 40,465,325 |
| 17 | Total · | $193,946,319 |

*This figure includes necessary increase for Social Security, Workmen's Compensation and other fixed charges contemplated by the approval of the Seven and one half (7½) percent salary increase.

This submission contemplated, among other things, a seven and one-half percent salary increase for professional and supporting school personnel as separate appropriation items outside the amounts allocable to professional services and other personnel salaries as computed pursuant to the "School Foundation Formula" made and provided for under the general laws of this State in Chapter 18 of the *Code*. Although agreeing with the Governor that professional and other personnel of the Department of Education should be granted a seven and one-half percent salary increase, the Legislature disagreed with the method of achieving that increase. The Legislature's approach was to provide for such increase within the School Foundation Formula. Accordingly, the Legislature enacted general law, Enrolled Committee Substitute For Senate Bill No. 19, effective July 1, 1974, and also amended the Governor's budget proposal for Account No. 295 by striking his specification of items within that account and inserting, by amendment, its own specification of itemization to accomplish a seven and one-half percent salary increase within the "School Foundation Formula" by insertion of the salary increase within the School Foundation Formula. The Legislature also found it necessary to increase the total appropriation for Account No. 295 from $193,946,319 to approximately $198,000,000. The Legislature's version of Account No. 295, and the Governor's subsequent veto action upon that amended account, appear as follows:

*39—State Department of Education—State Aid to Schools*

Acct. No. 295

1    Total .... *Reduced to* $*193,946,319* *and suspended upon in accompanying letter and attachment. A.A.M.Jr.*

As can be readily seen, the Governor reduced the amount appropriated by the Legislature to the original figure of $193,946,319 which he had previously submitted to the Legislature, but in making that reduction, the Governor, as well, added the words "and expanded upon in accompanying letter and attachment. A.A.M.Jr." In Executive Message No. 6 (the "accompanying letter"), as a part of his objections to the legislative action in refer-

ence to Account No. 295 and in stating his reasons therefor, the Governor re-specified in a different but substantially similar form, his initial submission to the Legislature for this account, as follows:

39—*State Department of Education—State Aid to Schools*
Acct. No. 295

| | |
|---|---|
| Professional Services | $157,873,599 |
| Salaries—Other Personnel | 32,111,690 |
| Fixed Charges * | 14,625,351 |
| Transportation Charges | 5,421,927 |
| Administration | 1,435,060 |
| Other Current Expenses | 17,220,855 |
| Conversion Costs | 414,709 |
| National Average Attainment | 2,978,385 |
| Program Improvement | 1,630,068 |
| Increased Enrollment | 700,000 |
| Sub Total | $234,411,644 |
| Less Local Share | 40,465,325 |
| TOTAL | $193,946,319 |

* This figure includes necessary increase for Social Security Workmen's Compensation and other fixed charges.

At least two questions arise involving first, the validity of the Governor's veto action in reducing the total appropriation for Account No. 295 from approximately $198,000,000 to his originally submitted figure of $193,946,319, and secondly, the validity, if any, of the Governor's attempted insertion of new language and new item amounts into the Budget Bill by incorporation through reference to his Executive Message containing objections to and reasons for disapproval of the legislative amendments to Account No. 295.

In the first *Brotherton* decision, *supra*, this Court held invalid the Governor's veto of Account No. 295 which, if permitted, would have wholly deleted the funds provided for the operation of the public school system in the State. There, the majority of the Court held:

"Inasmuch as our Constitution provides in Article 12, Section 1 thereof that the Legislature shall provide for a thorough and efficient system of free schools, the action of the Governor, in eliminating in their entirety the funds provided for that purpose, constitutes an abuse of discretion and will not be permitted." *Syllabus* point 9., *State ex rel. Brotherton v. Blankenship, Supra.*

The relators rely upon that decision and a previous decision of this Court construing the predecessor to the Modern Budget Amendment, in effect prior to 1968. In *State ex rel. Trent v. Sims,* 138 W. Va. 244, 77 S.E.2d 122 (1953), this Court held that the Board of Public Works and the Legislature were bound by the provisions of the previous Budget Amendment to provide and appropriate for the public schools all estimates of need submitted by school authorities without reduction if such estimates were equal to or less than the amount appropriated for such purpose by the Legislature at its previous session. The common interpretation of that decision was that the Board of Public Works and Legislature could not reduce the estimates of requirements submitted to them by the Department of Education. As suggested in an able concurrence by Judge Browning, that part of the *Trent* ruling could have resulted in all other units of government being deprived of necessary funds to operate in order to fund a mandatory minimum for the operation of the school system in the State if an economic recession were to occur which resulted in drastic reduction of State revenues.

Perhaps with the recognition of that decision, the drafters of the Modern Budget Amendment in 1968 specifically omitted from that amendment proposal any language which would prevent the Governor, as successor to the Board of Public Works, from reducing estimates submitted to him by the Department of Education incident to the Governor's duty to prepare and submit a Budget Bill to the Legislature. We presume such omission to have been intentional. 16 Am.Jur.2d, *Constitutional Law* § 80 (1964). In this regard, the *Trent* decision does not inhibit either the Governor or the Legislature from the exercise of veto or amendatory action upon the budget proposals submitted by the Department of Education. Reference must now be made to the Modern Budget Amendment.

Although this Court held in the first *Brotherton* decision that the Governor abused his discretion in reducing the proposal for the Department of Education in Ac-

count No. 295 to zero and his veto was an unauthorized and void act, that case does not furnish authority to prevent or inhibit the Governor from exercising a veto by way of reasonable reduction of an item or part of an item. Viewing, as we do, the Governor's veto power to be broad, and expansively granted through Subsection D(11) of the Modern Budget Amendment, we confirm his right to reduce the total appropriation in Account No. 295 from approximately $198,000,000 to approximately $194,000,000.

We also reject, out of hand, the contention of the relators that a general law, providing that schools shall be funded at a certain level and in a certain manner, which is inconsistent with the plain provisions of Article VI, Section 51 of the West Virginia Constitution, inhibits constitutional veto actions exercised pursuant to Article VI, Section 51, *supra*. Serious contentions cannot be made that statutes control constitutions; the contrary is obviously true.

As to the secondary issue relating to the Governor's affirmative action in suggesting to the Department of Education that its moneys appropriated by the Legislature should be expended in accordance with language and line item insertion into his Executive Message we are confronted with a novel approach in the exercise of a veto power. As was indicated in the early case of *State v. Mounts*, 36 W. Va. 179, 14 S.E. 407 (1892), the executive's power to veto laws passed by the Legislature is generally thought to be negative in nature rather than affirmative. While that principle has been somewhat abrogated by the broad grant of powers given the Governor in relation to appropriation measures and specifically granted to the Office of Governor in Article VI, the Legislative Article of the West Virginia Constitution, the principle of *State v. Mounts*, *supra*, retains some life. The Governor has not been given the power to affirmatively legislate in the Modern Budget Amendment. As the Legislature is limited in its ability to amend the Budget Bill submitted to it by the Governor in Section B(5) of the Modern Budget Amendment, the Governor is likewise

limited in his ability to amend the Budget Bill after its introduction for consideration by the legislative bodies. Subsection B(4) explicitly provides, in limitation of the Governor's powers, that:

"The governor may, with the consent of the legislature, before final action thereon by the legislature, amend or supplement the budget to correct an oversight, or to provide funds contingent on passage of pending legislation, and in case of an emergency, he may deliver such an amendment or supplement to the presiding officers of both houses; and the amendment or supplement shall thereby become a part of the budget bill as an addition to the items of the bill or as a modification of or a substitute for any item of the bill the amendment or supplement may affect."

Consistent with the general law of *State v. Mounts, supra,* the Governor was not given authority by the Modern Budget Amendment to legislate on a subject or amount not previously made law by approval of both houses of the Legislature. If such power had been intended, it would have been granted by the people to the Governor explicitly. Such power was not extended to the Governor by the people.

We note for comparison that the principle applied in Part III of this opinion, *supra,* in reaffirmance of the holding of *syllabus* point 8. of the 1973 budget decision, is not in any manner violative of the inhibition against affirmative action by the Governor in the appropriation process. As noted, *syllabus* point 8. authorizes the Governor to reinsert amounts up to and equal to sums appropriated by the Legislature in the Budget Bill and contemplates, as well, the reinsertion of language or parts thereof provided for in the Budget Bill as submitted. The "reinsertion" principle, however, does not contemplate, or permit of the Governor, affirmative language amendment to the Budget Bill after its submission without prior approval by the Legislature, nor does it contemplate "appropriation", by the Governor through veto exercise in monetary amounts in ex-

cess of that previously approved by the Legislature in the enactment of the Budget Bill.

Accordingly, if the Governor intended by specification of Account No. 295 in his veto message to thereby amend the Budget Bill affirmatively, he fails in that regard. We view such language as directory only to the State Department of Education and as mere surplusage to the Budget Bill. As enacted and later vetoed by the Governor, Account No. 295 appropriates an unclassified total of $193,946,319 to the State Department of Education—State Aid to Schools.

For the reasons stated in this opinion, the true Budget Act shall be published as follows:

(1) Wherein the Governor has not altered, disapproved, or reduced the Budget Act, it shall be published as enacted by the Legislature.

(2) Wherein the Governor has altered, disapproved, or reduced the Budget Act and the Governor's veto actions have not been overriden by the Legislature or objected to herein by the relators, the Budget Act shall be published as altered, disapproved or reduced by the Governor.

(3) The following accounts shall be published as altered and approved by the Governor: Numbers 101, 102, 295, 350, 485, 670, "Sec. 3—*Classification of Appropriations*—an appropriation for: 'Personal Services', etc.", and "Sec. 5—*Appropriations from Revenue Sharing Trust Fund*, Item IV—Department of Natural Resources . . . ."

(4) The following account shall be published or deleted as modified by this opinion: Account No. 103 shall be restored to reflect the increase by the *Legislature's addition* of an unclassified appropriation of $250,000 to that account for expenditure by that body according to its inherent power to conduct its internal operations; language stricken by the Governor's veto shall be omitted from the account.

(5) Account No. 641 shall be deleted as an appropriation item from the Budget Act.

The writ of mandamus praying that the respondent be compelled to publish the true Budget Act, as molded and as directed in this opinion, is awarded.

*Writ, as molded,*
*awarded.*

*Neely, Justice, dissenting:*

I respectfully dissent from the holding of the majority of the Court in syllabus points 6, 9, 11, 12, 15, and 16 for the same reasons that I dissented in *State ex rel. Brotherton v. Blankenship*, ___ W. Va. ___, 207 S.E.2d 421, at p. 436 (1973). As my dissent is based upon broad theoretical considerations with regard to the appropriate division of constitutional powers based upon history and reason, there is no need to reiterate here in detail what I have articulated elsewhere.